UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID G. THORNE, | ) | Case No. 5:06CV872 |
| | ) | |
| Petitioner, | ) | JUDGE JAMES GWIN |
| | ) | |
| v. | ) | Magistrate Judge George J. Limbert |
| | ) | |
| ERNEST MOORE, Warden, | ) | |
| | ) | |
| Respondent. | ) | **Report and Recommendation** |
| | ) | **of Magistrate Judge** |
| | ) | |
| | ) | |

Petitioner David G. Thorne ("Petitioner") has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF Dkt. #1.  Petitioner seeks relief for alleged constitutional violations that occurred during his Stark County, Ohio Court of Common Pleas conviction for one count of Complicity to Commit Aggravated Murder in violation of Ohio Revised Code ("O.R.C.") § 2903.01.  ECF Dkt. #1.  On June 27, 2006, Respondent Ernest Moore ("Respondent") filed an answer.  ECF Dkt. #8.  February 6, 2009, Petitioner filed a traverse.  ECF Dkt. #48.  On April 24, 2009, on leave of the Court, Respondent filed a reply to Petitioner's traverse.  ECF Dkt. #55.  On May 7, 2009, on leave of the Court, Petitioner filed a sur-reply.  ECF Dkt. #57.

The case was referred to the undersigned for a Report and Recommendation.  ECF Dkt. #4. For the following reasons, the undersigned RECOMMENDS that the Court DISMISS the petition in its entirety with prejudice:

## I.      SYNOPSIS OF THE FACTS

The Fifth District Court of Appeals of Ohio set forth the facts of this case on direct appeal. These binding factual findings "shall be presumed to be correct," and Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. §2254(e)(1);

*Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998), *cert. denie*d, 119 S.Ct. 2403 (1999).  As set

forth by the Fifth District Court of Appeals, the facts are:

> On September 15, 1999, the Stark County Grand Jury indicted appellant with one count of aggravated murder in violation of R.C. 2903.01. The grand jury also added the specification appellant conspired to committed [sic] the murder for hire, in violation of R.C. 2929.04(A)(2). At his September 16, 1999 arraignment, appellant plead not guilty to the charge. Appellant was charged with hiring Joseph Wilkes to kill appellant's ex-girlfriend, Yvonne Layne. Ms. Layne was the mother of five children. Appellant was the father of one of Ms. Layne's children, Brandon. Mr. Wilkes confessed he killed Ms. Layne in her home on March 31, 1999. Mr. Wilkes agreed to testify truthfully about the crime and appellant's involvement in the planning of the murder in exchange for a life sentence with possibility of parole after thirty years. A jury trial commenced on January 18, 2000, at which time the following evidence was adduced. On April 1, 1999, Tawnia Layne, the victim's mother, went to Yvonne Layne's home to take one of her grandchildren to school. When she arrived, Tawnia found her daughter's body. Yvonne's throat had been cut, and her body was lying in a pool of blood. Yvonne's five young children were awake in the house. Tawnia Layne called the police. While there were two partial bloody footprints at the scene, there was little other physical evidence. The police were unable to recover any usable fingerprints. Although a knife was recovered from a nearby storm sewer, the knife had been wiped clean. As part of the investigation, the police discovered Yvonne had recently implemented paternity proceedings for her son, Brandon. As a result, appellant was ordered to pay child support in the amount of $358 per month with weekly payroll deductions beginning in March, 1999. By the time of his first payment, appellant owed more than $700 in back support. The Alliance police learned of Mr. Wilkes through Rose Mohr. Ms. Mohr contacted the police to tell them she and her boyfriend, Chris Campbell, had spoken with Mr. Wilkes at the Carnation Mall in Alliance on the night of March 31, 1999. According to Ms. Mohr, Mr. Wilkes told her and Mr. Campbell he was in Alliance because he had been hired to kill a woman. Mr. Wilkes made statements he had purchased a knife at Walmart and showed Ms. Mohr and Mr. Campbell the knife. Ms. Mohr remembered Mr. Wilkes saying he was hired for money to commit the murder "for a guy." In contrast, Mr. Campbell recalled Mr. Wilkes to state his "girlfriend" had paid for a room for him at the adjoining Comfort Inn, this girlfriend had dropped him off, and the girlfriend had asked Mr. Wilkes to commit the murder. In July 1999, Mr. Wilkes confessed to the murder and implicated appellant, claiming appellant paid Mr. Wilkes to kill Ms. Layne. Mr. Wilkes gave details: how appellant planned the murder; provided an alibi for himself; provided Mr. Wilkes with a place to stay before and after the murder; provided transportation to and from that location; and provided money to purchase the batting gloves and the knife used in the murder. Mr. Wilkes testified appellant wanted custody of his son, Brandon, and did not want to pay child support to Ms. Layne. Mr. Wilkes testified he rented a room at the Comfort Inn at Carnation Mall in Alliance on March 31, 1999. He then purchased batting gloves and later a knife at the K Mart in the mall, walked to Ms. Layne's residence, and committed the murder. He told the police he threw the knife in a storm sewer near the house, and disposed of his gloves in a McDonald's dumpster. The next morning, he claimed appellant picked him up at the hotel and took him to a friend's house. Mr. Wilkes hid his black nylon pants in the woods near his friend's house. He could not recall what he did with his shoes or his shirt. After five days of testimony and deliberation, the jury found appellant guilty of aggravated murder and guilty of the specification appellant conspired to commit murder for hire. On January 27, 2000, a sentencing hearing was held. After hearing the testimony, the jury was unable to reach a verdict as to whether appellant should die for his crime. The trial court declared a mistrial as to the penalty phase of the trial and proceeded to sentence appellant

according to *State v. Springer* (1992), 63 Ohio St.3d 167. In a February 3, 2000 Judgement Entry, the trial court sentenced appellant to a term of life in prison without parole eligibility. It is from this judgment entry appellant prosecutes his appeal, assigning the following as error:

ECF Dkt. #8, Ex. 7; *State v. Thorne*, Case No. 2000CA00067, 2000 WL 1732540 at *1 (Ohio App. 5 Dist., Nov. 20, 200), unreported.  In a subsequent order affirming the trial court's denial of a petition for postconviction relief, the Fifth District Court of Appeals stated:

{¶ 2} On September 15, 1999, the Stark County Grand Jury indicted appellant on one count of aggravated murder, in violation of R.C. 2903.01. The grand jury added a complicity for hire specification, pursuant to R.C. 2929.04(A)(2). The indictment arose from the allegation that appellant hired Joseph Wilkes to kill appellant's ex-girlfriend, Yvonne Layne. Ms. Layne was the mother of five children. Appellant was the father of one of Ms. Layne's children, Brandon. After a police investigation which led to Mr. Wilkes, Mr. Wilkes agreed to testify truthfully about the crime and appellant's involvement in the planning of the murder in exchange for a life sentence with possibility of parole after 30 years.

{¶ 3} A jury trial commenced on January 18, 2000, at which time the following evidence was adduced. On April 1, 1999, Tawnia Layne, the victim's mother, went to Yvonne Layne's home to take one of her grandchildren to school. When she arrived, Tawnia found her daughter's body. Yvonne's throat had been cut, and her body was lying in a pool of blood. Yvonne's five young children were awake in the house but were locked in their rooms. Tawnia Layne called the police.

{¶ 4} While there were two partial bloody footprints at the scene, there was little other physical evidence. The police were unable to recover any usable fingerprints.

{¶ 5} As part of the investigation, the police discovered that Ms. Layne had recently implemented paternity proceedings for her son, Brandon. As a result, appellant had been ordered to pay child support in the amount of $358 per month, with weekly payroll deductions beginning in March, 1999. By the time of his first payment, appellant owed more than $700 in back support.

{¶ 6} The Alliance police learned of Joseph Wilkes through Rose Mohr. Ms. Mohr contacted the police to tell them that she and her boyfriend, Chris Campbell, had spoken with Mr. Wilkes at the Carnation Mall in Alliance on the night of March 31, 1999, the night of the murder. According to Ms. Mohr, Mr. Wilkes told her and Mr. Campbell that he was in Alliance because he had been hired to kill a woman. Mr. Wilkes made statements that he had purchased a knife at K Mart and showed the knife to Ms. Mohr and Mr. Campbell. Ms. Mohr remembered Mr. Wilkes saying that he was hired for money to commit the murder "for a guy." In contrast, Mr. Campbell recalled Mr. Wilkes stating that his "girlfriend" had paid for a room for him at the adjoining Comfort Inn and that the girlfriend had asked Mr. Wilkes to commit the murder. Ms. Mohr claimed that at this meeting, Mr. Wilkes wrote his name and phone number on a business card and gave it to her.

{¶ 7} In July, 1999, Mr. Wilkes confessed to the murder and implicated appellant, claiming that appellant paid him to kill Ms. Layne. Mr. Wilkes claimed that appellant wanted custody of his son, Brandon, and did not want to pay child support to Ms.

-3-

Layne. Mr. Wilkes gave details on how appellant 1) planned the murder, 2) provided an alibi for himself, 3) provided Mr. Wilkes with a place to stay before and after the murder, 4) provided transportation to and from that location, and 5) provided money to purchase batting gloves and the knife used in the murder.

{¶ 8} Specifically, Mr. Wilkes testified at trial that he rented a room at the Comfort Inn at Carnation Mall in Alliance on March 31, 1999. He then purchased batting gloves and, later, a knife at the K Mart in the mall, walked to Ms. Layne's residence, and committed the murder. He told the police he threw the knife in a storm sewer near the house, and disposed of his gloves in a McDonald's dumpster. Mr. Wilkes claimed that the next morning appellant picked him up at the motel and took him to a friend's house. Mr. Wilkes hid his nylon pants, which he claimed he had worn at the time of the murder, in the woods near his friend's house.

{¶ 9} Mr. Wilkes' took the police to a storm sewer where they recovered a knife and to where a pair of pants were found under some brush. The knife was consistent with the knife sold at K Mart, the knife shown to Mohr and Campbell and the murder weapon. The pants matched a description of the pants Mr. Wilkes was wearing at Carnation Mall the night of the murder.

{¶ 10} The knife and pants were tested for human blood. A preliminary test on the knife showed the possibility that there was human blood on the knife. However, further testing failed to return a positive result of human blood. No blood was found on the pants.

{¶ 11} However, the condition of the knife and pants was consistent with them having been subject to the elements for several months. According to testimony, this could have accounted for the failure to find blood on either item.

{¶ 12} In addition, there was testimony concerning the shoes worn by Mr. Wilkes on the night of the murder. Mr. Wilkes testified that he was wearing Nike shoes. A Detective from the Alliance Police Department testified at trial that as a result of the investigation, the Detective had a clerk at Dick's Sporting Goods identify the tread pattern of the shoe prints found in the blood. According to the Detective, the clerk provided the Detective with a shoe that "pretty much" matched the tread pattern. That shoe was a Nike. Tr. 1417-1418.

{¶ 13} After five days of testimony and deliberation, the jury found appellant guilty of aggravated murder as well as the complicity for hire specification. On January 27, 2000, a sentencing hearing was held. After hearing the testimony, the jury was unable to reach a verdict as to whether appellant should receive the death penalty. Accordingly, the trial court declared a mistrial as to the penalty phase of the trial and proceeded to sentence appellant to a term of life in prison without parole eligibility, pursuant to *State v. Springer* (1992), 63 Ohio St.3d 167, 586 N.E.2d 96.

{¶ 14} Appellant appealed his conviction and sentence to this Court. Appellant's conviction and sentence was affirmed.FN1 Appellant appealed this Decision to the Ohio Supreme Court. The Ohio Supreme Court declined to accept the case for further review.

> FN1  *State v. Thorne*, Stark App. No.2000-CA-00067, 2000 WL 1732540, appeal dismissed (2001), 91 Ohio St.3d 1472, 744 N.E.2d 193.

*State v. Thorne*, No. 2003CA00388, 2004 WL 2980359 at *1-*3 (Ohio App. 5 Dist., Dec. 16, 2004),

-4-

unreported.  These factual findings are also presumed to be correct pursuant to 28 U.S.C. §2254(e)(1), and Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence.  *See Rault v. State of La.*, 772 F.2d 117, 131 (5th Cir. 1985) (" The March 1985 state post-conviction hearing, at which Rault was represented by counsel, was full, fair, and adequate, and Rault was allowed to make full development of the relevant facts. Indeed, there has been no suggestion that any other relevant evidence could be submitted in support of Rault's claims. To the extent that they are fairly supported by the record, the factual findings of the state court in those proceedings are presumed to be correct."); *Cook v. Florida Parole and Probation Com'n*, 749 F.2d 678, 680 (11th Cir. 1985) (indicating that factual findings in a state postconviction proceeding are presumed correct in federal habeas proceeding if supported by substantial evidence at full and fair hearing).

## II.  PROCEDURAL HISTORY

### A.  State Trial Court

On September 15, 1999, the Stark County, Ohio prosecuting attorney filed an indictment that had been returned by the Grand Jury, charging Petitioner with: Complicity to Aggravated Murder in violation of O.R.C. § 2303.01, 2923.03, with a death penalty specification pursuant to O.R.C. § 2929.04(A)(2).  ECF Dkt. #8, Ex. 1.

On January 12, 2000, the case proceeded to a jury trial.  ECF Dkt. #8, Attach. #31-68 (trial transcript, hereinafter "Tr.").  On January 25, 2000, the jury convicted Petitioner of Complicity to Aggravated Murder as charged in the indictment.  *Id*. at 1808.  On January 28, 2000, the Court granted a mistrial on the sentencing phase of Petitioner's trial.  Tr. at 1983.  The trial judge then sentenced Petitioner to life imprisonment without the possibility of parole.  *Id*. at 1989, ECF Dkt. #8, Ex. 2.

On February 11, 2000, Petitioner filed a motion for a new trial.  ECF Dkt. #8, Ex. 3.  On February 17, 2000, the trial court denied Petitioner's motion.  ECF Dkt. #8, Ex. 4.

**B.      Direct Appeal**

On August 3, 2000, Petitioner filed a brief in support of his direct appeal, raising the following assignments of error:

> I.      THE JURY'S VERDICT OF GUILTY WAS NOT SUPPORTED BY THE EVIDENCE, OR IN THE ALTERNATIVE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE
>
> II.     APPELLANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

ECF Dkt. #8, Ex. 5.

On November 20, 2000, the Ohio Court of Appeals for the Fifth District denied the appeal and affirmed the trial court's judgment.  ECF Dkt. #8, Ex. 7.

**C.      Supreme Court of Ohio**

On January 4, 2001, Petitioner filed a brief in support of jurisdiction in the Supreme Court of Ohio, raising the following propositions of law:

> <u>Proposition of Law No. 1</u>:      The jury's verdict of guilty was not supported by the evidence, or in the alternative was against the manifest weight of the evidence
>
> <u>Proposition of Law No. 2</u>:      Appellant was denied his constitutional right to effective assistance of counsel

ECF Dkt. #8, Ex. 8.  On March 21, 2001, the Supreme Court of Ohio dismissed the appeal as not involving a substantial constitutional question.  ECF Dkt. #8, Ex. 10.

**D.      Post-conviction Petition**

On November 13, 2000, prior to filing a direct appeal in the Supreme Court of Ohio, Petitioner filed a post-conviction petition in the Stark County, Ohio Court of Common Pleas.  ECF Dkt. #8, Ex. 11.  Petitioner raised the following claims for relief:

> 1.      Petitioner's conviction is voidable because his counsel's performance was deficient in several respects.  The trial record does not contain adequate evidence regarding this issue however, the Petitioner wishes to pursue the following in this proceeding.  *State vs. Cooperrider* (1983) 4 Ohio St. 3d 226.
>
> 2.      Petitioner's conviction is voidable because the State of Ohio and Stark County Prosecutor's office knowingly allowed false or misleading testimony in the Petitioner's case.  The false and misleading testimony includes, but is not limited to, the testimony of Detective Sampson's testimony that those who know Yvonne Layne originally mentioned only Petitioner Thorne and Eric

> Cameron's names as possible suspects. Testimony about which knife was used to make bloody swipe marks on a pillow case in Yvonne Layne's home was also false or misleading.

*Id.*

On January 4, 2001, Petitioner filed an amended post-conviction petition in the Stark County, Ohio Court of Common Pleas. ECF Dkt. #8, Ex. 12. Petitioner raised the following claims for relief:

1. Petitioner's conviction is voidable because his counsel's performance was deficient in several respects. The trial record does not contain adequate evidence regarding this issue however, the Petitioner wishes to pursue the following in this proceeding. *State vs. Cooperrider* (1983) 4 Ohio St. 3d 226.

2. Petitioner's conviction is voidable because the State of Ohio and Stark County Prosecutor's office knowingly allowed false or misleading testimony in the Petitioner's case. The false and misleading testimony includes, but is not limited to, the testimony of Detective Sampson's testimony that only Petitioner Thorne's and Eric Cameron's names were mentioned as possible suspects by those who knew Yvonne Layne. Testimony about which knife was used to make bloody swipe marks on a pillow case in Yvonne Layne's home was also false or misleading. On April 1, 1992, Dennis M. Florea, a criminalist at the Canton-Stark County Crime Laboratory, determined that the impressions are "consistent with and could have been made by" a kitchen knife found in a field near Yvonne Layne's home that was likewise found to be consistent with a set of knives she owned. On October 5, 1999, however, Florea determined that the swipe marks also could have been made by a much-smaller knife Wilkes said he used to commit the crime. During Thorne's trial, Florea went even further and said that the impression found on that pillowcase was more consistent with Wilkes' knife than with the kitchen knife. Florea's testimony contradicted that of criminalist Jennifer Bloink that the bloody swipes "appear to be somewhat narrow with the end tapering to a point." The kitchen knife blade tapered to just such a point, but the knife allegedly used by Wilkes did not.

3. Petitioner's conviction is voidable because the State of Ohio, through the Stark County Prosecutor's Office and the Alliance Police Department, concealed, suppressed and failed to disclose relevant exculpatory evidence. This includes, but is not limited to, the State of Ohio's failure to disclose the statements of a material exculpatory witness, George Hale.

*Id.* On January 10, 2001, Petitioner filed a second amended post-conviction petition in the Stark County, Ohio Court of Common Pleas. ECF Dkt. #8, Ex. 13. Petitioner raised the following claims for relief:

1. Petitioner's conviction is voidable because his counsel's performance was deficient in several respects. The trial record does not contain adequate evidence regarding this issue however, the Petitioner wishes to pursue the following in this proceeding. *State vs. Cooperrider* (1983) 4 Ohio St. 3d 226.

2.       Petitioner's conviction is voidable because the State of Ohio and Stark County Prosecutor's office knowingly allowed false or misleading testimony in the Petitioner's case.  The false and misleading testimony includes, but is not limited to, the testimony of Detective Sampson's testimony that only Petitioner Thorne's and Eric Cameron's names were mentioned as possible suspects by those who knew Yvonne Layne.  Testimony about which knife was used to make bloody swipe marks on a pillow case in Yvonne Layne's home was also false or misleading.  On April 1, 1992, Dennis M. Florea, a criminalist at the Canton-Stark County Crime Laboratory, determined that the impressions are "consistent with and could have been made by" a kitchen knife found in a field near Yvonne Layne's home that was likewise found to be consistent with a set of knives she owned. On October 5, 1999, however, Florea determined that the swipe marks also could have been made by a much-smaller knife Wilkes said he used to commit the crime.  During Thorne's trial, Florea went even further and said that the impression found on that pillowcase was more consistent with Wilkes' knife than with the kitchen knife. Florea's testimony contradicted that of criminalist Jennifer Bloink that the bloody swipes "appear to be somewhat narrow with the end tapering to a point." The kitchen knife blade tapered to just such a point, but the knife allegedly used by Wilkes did not.

3.       Petitioner's conviction is voidable because the State of Ohio, through the Stark County Prosecutor's Office and the Alliance Police Department, concealed, suppressed and failed to disclose relevant exculpatory evidence. This includes, but is not limited to, the State of Ohio's failure to disclose the statements of a material exculpatory witness, George Hale.

*Id*.  On December 27, 2001, Petitioner filed a third amended post-conviction petition in the Stark County, Ohio Court of Common Pleas.  ECF Dkt. #8, Ex. 14.  Petitioner raised the following claims for relief:

1.       Petitioner's conviction is voidable because his counsel's performance was deficient in several respects.

2.       Petitioner's conviction is voidable because the State of Ohio and Stark County Prosecutor's office knowingly allowed false or misleading testimony in the Petitioner's case.  The false and misleading testimony includes, but is not limited to, the testimony of Detective Sampson's testimony that only Petitioner Thorne's and Eric Cameron's names were mentioned as possible suspects by those who knew Yvonne Layne.  Testimony about which knife was used to make bloody swipe marks on a pillow case in Yvonne Layne's home was also false or misleading.  On April 1, 1992, Dennis M. Florea, a criminalist at the Canton-Stark County Crime Laboratory, determined that the impressions are "consistent with and could have been made by" a kitchen knife found in a field near Yvonne Layne's home that was likewise found to be consistent with a set of knives she owned. On October 5, 1999, however, Florea determined that the swipe marks also could have been made by a much-smaller knife Wilkes said he used to commit the crime.  During Thorne's trial, Florea went even further and said that the impression found on that pillowcase was more consistent with Wilkes' knife than with the kitchen knife. Florea's testimony contradicted that of criminalist Jennifer Bloink that the bloody swipes "appear to be somewhat narrow with the end tapering to a point." The kitchen knife blade tapered to

just such a point, but the knife allegedly used by Wilkes did not.  A significant amount of the testimony offered at trial was different than the testimony introduced at other proceedings, including the preliminary hearing.

3.   Petitioner's conviction is voidable because the State of Ohio, through the Stark County Prosecutor's Office and the Alliance Police Department, concealed, suppressed and failed to disclose relevant exculpatory evidence.  This includes, but is not limited to, the State of Ohio's failure to disclose the statements of a material exculpatory witness, George Hale.

4.   Prosecutorial misconduct deprived the Petitioner of his right to a fair trial.

5.   A key prosecutorial witness, Detective Sampson, was observed sitting by the jury box and flirting with one of the female jurors who was in turn flirting with him as more fully set fort in the attached affidavit.  As a result of these acts, petitioner has been prejudiced and his right to trial by a fair and impartial jury has been violated.

6.   During Petitioner's capital trial there was evidence introduced relating to a shoe print which was found at the murder scene. (T. Vol V. pp. 1417-1418).  Detective Sampson testified that a store clerk at a Dick's Sporting Goods provided a shoe which purportedly matched the pattern. (T. Vol. V. pp. 1418).  There was no foundation as to the qualification of this clerk to match shoe prints.  Despite the lack of foundation, the court permitted this testimony.

7.   The Petitioner was denied his Constitutional right to confront his accusers when the Court permitted the State to introduce a statement purportedly made by Joe Wilkes that he was in town to do a job. (T. Vol IV, pp. 1029-1034).  The Court admitted this statement pursuant to Rule 803(3) of the Ohio Rules of Evidence.

8.   Petitioner's conviction is voidable because the state's primary witness, Joseph Wilkes, has recanted his testimony that he was hired by Petitioner to kill Yvonne Layne as more fully set forth in the affidavit of Joseph Wilkes, attached hereto and incorporated by reference.

9.   The cumulative errors and defects which during the pretrial stage, trial, and sentencing, deprived the petitioner his right to fair trial.

*Id*.  On May 12, 2003, the Stark County Court of Common Pleas conducted an evidentiary hearing on Petitioner's post-conviction petition.  ECF Dkt. #8, Attach. 69-74.  On October 15, 2003, the court denied Petitioner's post-conviction petition.  ECF Dkt. #8, Ex. 19.

On February 18, 2004, Petitioner filed an appellate brief in the Ohio Court of Appeals for the Fifth District and raised the following assignments of error:

I.   THE TRIAL COURT ERRED IN FAILING TO GRANT POST-CONVICTION RELIEF TO APPELLANT BASED UPON THE STATE'S FAILURE TO DICLOSED [sic] EXCULPATORY EVIDENCE.

II.   THE TRIAL COURT ERRED IN FAILING TO GRANT POST-

-9-

CONVICTION RELIEF TO THE RECANTATION OF THE FORMER TESTIMONY OF THE STATE'S PRIMARY WITNESS.

III.    THE TRIAL COUT [sic] ERRED IN FAILING TO GRANT POST-CONVICTION RELIEF TO APPELLANT BASED UPON INADEQUATE REPRESENTATION OF COUNSEL.

IV.    THE TRIAL COURT ERRED IN FAILING TO GRANTED [sic] POSTCONVICTION RELIEF TO APPELLANT BASED UPON PROSECUTORIAL MISCONDUCT.

ECF Dkt. #8, Ex. 20.  On December 15, 2004, the appellate court affirmed the trial court's denial of the post-conviction petition.  ECF Dkt. #8, Ex. 22.

On January 28, 2005, Petitioner filed a memorandum in support of jurisdiction in the Supreme Court of Ohio raising the following propositions of law:

| | |
|---|---|
| Proposition of Law No. 1: | The trial court erred in failing to grant the Appellant a new trial based on the State's failure to disclose exculpatory and/or impeachment evidence favorable to the defense in violation of <u>Brady v. Maryland</u> |
| Proposition of Law No. 2: | The trial court erred to the prejudice of the Appellant by failing to grant a new trial based upon the recantation of the testimony of the State's primary witness. |
| Proposition of Law No. 3: | The trial court erred to the prejudice of the Appellant by failing to grant a new trial based on ineffective assistance of counsel. |
| Proposition of Law No. 4: | The trial court erred to the prejudice of the Appellant by failing to grant a new trial based upon misconduct of the Prosecuting Attorney. |

ECF Dkt. #8, Ex. 23.

On April 23, 2005, the Supreme Court of Ohio dismissed the appeal as not involving a substantial constitutional question.  ECF Dkt. #8, Ex. 25.

**F.    28 U.S.C. § 2254 Petition**

On April 13, 2006, Petitioner filed the instant petition for a writ of habeas corpus.  ECF Dkt. #1.  Petitioner has raised the following grounds for relief:

**Ground One:**
Petitioner was denied his right to a fair trial and due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution when the State withheld evidence favorable to the defense.

-10-

**Supporting Facts:** Yvonne Layne's body was discovered on April 1, 1999. at approximately 12:30 p.m. Ms. Layne was found in her home, face-down on the floor. surrounded by a pool of blood. The cause of Ms. Layne's death was an incised wound to her neck, measuring 8 inches across and 4 inches deep. Alliance Police Department officers and Stark County detectives noted three partial bloody shoe prints in the crime scene and large amounts of blood pooling and blood spatter, but recovered very little physical evidence from the scene. The assistant Stark County coroner estimated that Ms. Layne died sometime after 7:00 p.m. on March 31, 1999.

Alliance police had no promising leads following Ms. Layne's murder. However. on April 1, 1999, a neighbor of Ms. Layne's by the name of George Hale spoke to Detective Sampson and told him of suspicious activity he had witnessed earlier that morning. Mr. Hale told Sampson that as he was walking by Ms. Layne's home around 9:30 a.m. on April I, 1999, his attention was drawn by the sound of crying puppies coming from the Layne home. When he looked, Mr. Hale observed a white male wearing blue jeans and a short-sleeve shirt exit Ms. Layne's house carrying a large trash bag. The man carried the trash bag around the west side of Ms. Layne's home. Mr. Hale described the man as having medium-length hair, approximately 5'09" tall, 180 pounds, and in his mid-to-late 20s. Mr. Hale was later shown two photo arrays, containing pictures of Mr. Thorne and Joseph Wilkes, the confessed murderer allegedly hired by Mr. Thorne. Mr. Hale did not identify the man he saw exit Ms. Layne's home carrying a trash bag in either photo array.

The State failed to disclose Mr. Hale's identity or his statement to the defense, despite proper requests made by the defense. Thus, Mr. Thorne did not learn of Mr. Hale's statement until well after Mr. Thorne's trial was concluded. The State's failure to disclose this exculpatory evidence greatly prejudiced Mr. Thorne. Had this evidence been presented at trial. there is a reasonable probability that the outcome of the trial would have been different.

**Ground Two:**

Petitioner was denied the effective assistance of trial counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.

**Supporting Facts:** The individual and cumulative effect of trial counsel's egregious errors served to deny Mr. Thorne a fair trial. Counsel's errors included:

> (l) Mr. Thorne was denied the right to effective assistance of counsel as guaranteed to him through the Sixth and Fourteenth Amendments to the United States Constitution. Trial counsel's performance was objectively unreasonable in that counsel failed to conduct any investigation into the case in order to prepare an adequate defense for Mr. Thorne. Mr. Thorne supplied his counsel with the identities and contact information for witnesses to contradict the State's case, yet counsel ignored his repeated requests. Counsel did not even interview the State's main expert witnesses, such as the coroner and the forensic scientists, and was not adequately prepared to cross examine these witnesses. Furthermore, trial counsel made no requests for forensic testing of key evidentiary items introduced in Mr. Thorne's trial. As a result of counsel's failure to adequately prepare for Mr. Thorne's trial, at which he was facing a possible death sentence, the State introduced severely prejudicial evidence. absent objection thereby prejudicing Mr. Thorne.

> (2) Trial counsel was ineffective for failing to obtain a forensic expert to explain to the jury the significance of the blood spatter evidence. The State's

case against Mr. Thorne depended exclusively on the testimony and credibility of Joseph Wilkes, who claimed he carried out the murder at Mr. Thorne's request and gave a detailed account of how he murdered Ms. Layne. Given that the most significant evidence at the crime scene was the blood spatter evidence, and there was little other evidence to corroborate Wilkes's story, it was patently unreasonable for trial counsel to not engage an expert in forensic science. As was demonstrated during Mr. Thorne's postconviction evidentiary hearing, a forensic expert would have helped the jury to understand the blood spatter evidence, and would have significantly undermined Wilkes's testimony. Thus, had the jury had the opportunity to consider the report of a forensic scientist- or *any* evidence contradicting Wilkes's incredible story- there is a reasonable probability that the result of Mr. Thorne's trial would have been different. Consequently, trial counsel's failure to engage experts and to locate witnesses to contradict Wilkes's story greatly prejudiced Mr. Thorne.

(3)[1] Trial counsel rendered ineffective assistance of counsel by failing to object to the prosecutor's repeated references, throughout trial, to Mr. Thorne's election to be represented by an attorney when questioned and to remain silent. The prosecutor's references to Mr. Thorne's invocation of his right to remain silent violated Mr. Thorne's constitutional rights to a fair trial and to due process of law, and further prejudiced the jury against him.

(4)[2] Mr. Thorne was also denied the effective assistance of trial counsel when counsel failed to object to the State's improper vouching of its primary witness during Mr. Thorne's trial. The prosecutor's statement encroached on the province of the jury thus prejudicing Mr. Thorne.

**Ground Three:**

Petitioner was not afforded the due process of law and was denied a fair trial, as guaranteed to him through the Fifth, Sixth. and Fourteenth Amendments to the United States Constitution.

**Supporting Facts:** The State's theory of motive against David Thorne was that he wanted sole custody of his young son and did not want to pay child support to Ms. Layne. To remedy the situation. the State argued that Mr. Thorne hired his 18-year old friend, Joseph Wilkes. to carry out a brutal murder for $300. The physical evidence of the crime scene belies the detailed account of the murder offered by Wilkes during Mr. Thorne's trial. (see Second Ground for Relief). Further, Joe Wilkes recanted his earlier testimony under oath, first in a deposition and then during an evidentiary hearing. despite receiving a thorough warning by the trial court, his counsel, and the prosecutors, that he could face the death penalty should he violate his plea agreement. Wilkes's recantation was supported by the testimony of Victoria Rhodes, Wilkes's youth minister. Rhodes testified at the postconviction evidentiary hearing and confirmed that the night before Wilkes testified at Mr. Thorne's trial, he said: "if I tell the truth they told me I would die, and I'm too young to die," There is ample evidence that Wilkes's recantation is credible. Moreover, in recanting, Wilkes' [sic] admitted that he lied under oath at Mr. Thorne's trial. Thus. David Thorne's conviction was based almost entirely on perjured testimony. and as such cannot stand.

---

[1]     Petitioner withdrew this ground in his traverse.  ECF Dkt. #48 at 38.

[2]     Petitioner withdrew this ground in his traverse.  ECF Dkt. #48 at 38.

**Ground Four:[3]**

Mr. Thorne was denied his rights to a fair trial and to due process of law, as guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States of America, when the prosecutor engaged in improper argument and other misconduct.

**Supporting Facts:** The individual and cumulative effect of the prosecutor's improper argument and other misconduct served to deny Mr. Thorne a fair trial. Examples of the misconduct engaged in by the prosecutor include:

> (1)The prosecutor made repeated references to Mr. Thorne's reluctance to talk to police during the criminal investigation, a direct violation of his Fifth Amendment right to remain silent.

> (2) The prosecutor engaged in improper vouching of Joe Wilkes veracity during the trial. The prosecutor's statements encroached on the province of the jury, prejudicing Mr. Thorne.

> (3) The prosecutor improperly elicited testimony in an attempt to show prior bad acts of Mr. Thorne. Throughout direct examination, the prosecutor repeatedly asked Wilkes about where he had obtained the drugs he claimed he was on the night of the murder in an attempt to represent Mr. Thorne as a drug dealer. Admission of this testimony was irrelevant and served to irrevocably prejudice Mr. Thorne in the eyes of the jury.

> (4) The prosecutor elicited testimony from Wilkes regarding Mr. Thorne's violent character. Specifically, the prosecutor questioned Wilkes about Mr. Thorne allegedly training him in "shoot fighting." The prosecutor consistently referred to the sport as a life-threatening and aggressive. During the State's direct examination, Wilkes testified that Mr. Thorne did not fear anyone and "shoot fighting" could be used to cause extreme pain. Defense counsel did not present evidence of Mr. Thorne's good character to rebut the State's theory, and the meager evidence presented on Mr. Thorne's behalf was irrelevant and incapable of undermining the State's case. (see Ground Two). Consequently, the testimony of Thorne's prior bad acts and instances of his violent character was highly improper and inadmissible.

**Ground Five:**

The cumulative effect of trial error violated Mr. Thorne's rights to due process and a fair trial.

**Supporting Facts:** Even if none of the foregoing errors, standing alone, is sufficient to warrant reversal for a new trial, the accumulation of those errors deprived Mr. Thorne of a fair trial and of the due process of law as guaranteed to him under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. The evidence against Mr. Thorne was far from overwhelming, and the cumulative effect of trial error denied Mr. Thorne his rights to due process and a fair trial and warrants a retrial.

ECF Dkt. #1. On April 5, 2007, Petitioner filed a motion for leave to conduct discovery. ECF Dkt.

---

[3]     Petitioner withdrew this ground in his traverse. ECF Dkt. #48 at 44.

-13-

#20.  On June 12, 2007, the undersigned granted Petitioner's motion for leave to conduct discovery. ECF Dkt. #26.  On February 6, 2009, Petitioner filed a traverse.  ECF Dkt. #48.  In his traverse, Petitioner withdrew sub-grounds 3 and 4 in Ground 2 and Ground 4 in its entirety.  *See* ECF Dkt. #48 at 38, 44.  On April 24, 2009, on leave of the Court, Respondent filed a reply to Petitioner's traverse.  ECF Dkt. #55.  On May 7, 2009, on leave of the Court, Petitioner filed a sur-reply.  ECF Dkt. #57.

## III.    PROCEDURAL BARRIERS TO REVIEW

A petitioner must overcome several procedural barriers before a court will review the merits of a petition for a federal writ of habeas corpus.  As Justice O'Connor noted in *Daniels v. United States*, "Procedural barriers, such as statutes of limitations and rules concerning procedural default and exhaustion of remedies, operate to limit access to review on the merits of a constitutional claim." 532 U.S. 374, 381 (2001); *see also United States v. Olano*, 507 U.S. 725, 731 (1993).

Further, the Supreme Court has held that it would be in the interests of the parties and the courts for the merits of a petition to be addressed forthwith if it is clear that the applicant does not even raise a colorable federal claim. *Granberry v. Greer*, 481 U.S. 129, 135 (1987); *Prather v. Rees*, 822 F.2d 1418, 1421-22 (6th Cir. 1987) (lack of exhaustion was properly excused where petition was plainly meritless, the state had not addressed exhaustion, and disposition of the case would not offend federal-state comity).

### A.    Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") statute of limitations period for filing a petition for a writ of federal habeas corpus is one year, and it begins to run on the date judgement became final.  28 U.S.C. § 2244(d)(1).  The AEDPA statute of limitations is not currently at issue in this case.  Respondent does contend that Petitioner has raised new grounds in his traverse and that he should properly move to amend his petition so the AEDPA statute of limitations can be considered.  ECF Dkt. #55 at 5.

### B.    Procedural Default

The procedural default doctrine serves to bar review of federal claims that a state court has declined to address when a petitioner does not comply with a state procedural requirement.

*Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  In these cases, "the state judgment rests on independent and adequate state procedural grounds." *Coleman,* 501 U.S. at 730.  For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004) citing *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991) (emphasis removed).  When the last explained state court decision rests upon procedural default as an "alternative ground," a federal district court is not required to reach the merits of a habeas petition.  *McBee v. Abramajtys*, 929 F.2d 264, 265 (6th Cir. 1991).  In determining whether a state court has addressed the merits of a petitioner's claim, federal courts must rely upon the presumption that there is no independent and adequate state grounds for a state court decision absent a clear statement to the contrary.  *Coleman*, 501 U.S. at 735.

Applying this presumption, the Sixth Circuit Court of Appeals established a four-pronged analysis to determine whether a claim has been procedurally defaulted.  *Maupin v. Smith*, 785 F.2d 135 (6th Cir. 1986).  Under the *Maupin* test, a reviewing court must decide:

(1)     whether the petitioner failed to comply with an applicable state procedural rule;

(2)     whether the state courts actually enforced the state procedural sanction;

(3)     whether the state procedural bar is an "adequate and independent" state ground on which the state can foreclose federal review; and

(4)     if the above are met, whether the petitioner has demonstrated "cause" and "prejudice."

*Id.* at 138.

Under the first prong of *Maupin*, there must be a firmly established state procedural rule applicable to the petitioner's claim and the petitioner must not have complied with the rule.  *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (state procedural bar that is not "firmly established and regularly followed" cannot serve to bar federal judicial review); *Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006).  The question of whether a state procedural rule was "firmly established and regularly followed" is determined as of the time at which it was to be applied. *Richey v. Mitchell*, 395 F.3d 660, 680 (6th Cir. 2005).

Under the second prong, the last state court to which the petitioner sought review must have invoked the procedural rule as a basis for its decision to reject review of the prisoner's federal

claims. *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (appeal dismissed for lack of jurisdiction); *Richey*, 395 F.3d at 678 ("a lapsed claim survives if the state court overlooked the default and decided the claim anyway"); *Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004) (if a state court does not expressly rely on a procedural deficiency, then a federal court may conduct habeas review); *Gall v. Parker*, 231 F.3d 265, 310 (6th Cir. 2000) (even if issue is not raised below, where state supreme court clearly addresses the claim, no procedural bar arises); *Boyle v. Million*, 201 F.3d 711, 716-17 (6th Cir. 2000) (where a state appellate court characterizes its earlier decision as substantive, the earlier decision did not rely on a procedural bar; therefore, the cause and prejudice test does not apply).

Under the third prong, a state judgment invoking the procedural bar must rest on a state law ground that is both independent of the merits of the federal claim and is an adequate basis for the state court's decision. *Munson v. Kapture*, 384 F.3d 310, 313-14 (6th Cir. 2004).

Under the fourth prong, a claim that is procedurally defaulted in state court will not be reviewable in federal habeas corpus unless the petitioner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or that failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 751. "Cause" is a legitimate excuse for the default, and "prejudice" is actual harm resulting from the alleged constitutional violation. *Magby v. Wawrzaszek*, 741 F.2d 240, 244 (9th Cir. 1984), *cert. denied*, 490 U.S. 1068 (1985). If a petitioner fails to show cause for his procedural default, the reviewing court need not address the issue of prejudice. *Smith v. Murray*, 477 U.S. 527 (1986).

Simply stated, a federal court may review federal claims:

> that were evaluated on the merits by a state court. Claims that were not so evaluated, either because they were never presented to the state courts (i.e., exhausted) or because they were not properly presented to the state courts (i.e., were procedurally defaulted), are generally not cognizable on federal habeas review.

*Bonnell v. Mitchel,* 301 F.Supp.2d 698, 722 (N.D. Ohio 2004). The above standards apply to the Court's review of Petitioner's claims.

## IV.   STANDARD OF REVIEW

If Petitioner's claims overcome the procedural barriers of time limitation, exhaustion and

procedural default, AEDPA governs this Court's review of the instant case because Petitioner filed his petition for the writ of habeas corpus pursuant to 28 U.S.C. § 2254 on February 26, 2007, well after the act's effective date of April 26, 1996.  *Harpster v. Ohio*, 128 F.3d 322, 326 (6th Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998).  Under Section 2254, a state prisoner is entitled to relief if he is held in custody in violation of the United States Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(d).

The AEDPA sets forth the standard of review for the merits of a petition for the writ of habeas corpus.  The AEDPA provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)  resulted in a decision that was *contrary to*, or involved an *unreasonable application of*, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).  In *Williams v. Taylor*, the Supreme Court clarified the language of 28 U.S.C. § 2254(d) and stated:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  Furthermore, the Supreme Court declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable."  *Id.*  Elaborating on the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id*.; *see also Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001).

-17-

The Sixth Circuit Court of Appeals offers the following guidelines for applying the AEDPA limitations:

A.   Decisions of lower federal courts may not be considered.

B.   Only the holdings of the Supreme Court, rather than its dicta, may be considered.

C.   The state court decision may be overturned only if:

    1.   It '[applies] a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases,' [the Supreme Court precedent must exist at the time of petitioner's direct appeal] or;

    2.   the state-court decision 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent;' or

    3.   'the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case;' or

    4.   the state court 'either unreasonably extends a legal principle from [a Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'

D.   Throughout this analysis the federal court may not merely apply its own views of what the law should be. Rather, to be overturned, a state court's application of Supreme Court of the United States precedent must also be objectively unreasonable.  That is to say, that 'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'  'An unreasonable application of federal law is different from an incorrect or erroneous application of federal law.'

E.   Findings of fact of the state courts are presumed to be correct. 'The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'

*Bailey v. Mitchell,* 271 F.3d 652, 655-56 (6th Cir. 2001) (internal citations omitted).

Finally, a reviewing federal court is bound by the presumption of correctness, under which

-18-

the federal court is obligated to "accept a state court's interpretation of the state's statutes and rules of practice." *Hutchinson v. Marshall*, 744 F.2d 44, 46 (6th Cir. 1984), *cert. denied*, 469 U.S. 1221 (1985); *see also Duffel v. Duttion*, 785 F.2d 131, 133 (6th Cir. 1986). The presumption of correctness is set forth in 28 U.S.C. § 2254(e), which provides:

> (e)(1)In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.

28 U.S.C. § 2254(e). The presumption of correctness applies to basic primary facts, and not to mixed questions of law and fact. *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir. 1993), *cert. denied,* 509 U.S. 907 (1993). The presumption also applies to "implicit findings of fact, logically deduced because of the trial court's ability to adjudge the witnesses' demeanor and credibility." *McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996), *cert. denied*, 520 U.S. 1257 (1997). Furthermore, a reviewing federal court is not free to ignore the pronouncement of a state appellate court on matters of law. *See Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676, n.4 (6th Cir. 2000). Petitioner has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## V.     ANALYSIS

### A.     Ground One: Alleged *Brady* Violation

#### i.     Scope of Ground One

Respondent first contends that Petitioner improperly raised new grounds for relief in his traverse rather than in his petition. ECF Dkt. #55 at 2 citing Habeas Corpus Rule 2(c). Respondent specifically argues that Petitioner initially alleged that the state violated *Brady v. Maryland*, 373 U.S. 83 (1963) by withholding the identity of George Hale; however, in his traverse Petitioner now seeks to assert *Brady* claims based upon the following list of undisclosed evidence:

> Ex. 1 – a transcript of a record between an unknown female, retired officer William Mucklo and Lloyd Sampson, referred to as a "psychic interview". During this interview, the officers reported to the psychic that a) Ms. Layne had personal relationships with numerous police officers, one of whom might have been the father of her youngest child; b) rumors that Ms. Layne was involved with illegal drugs or the

"mob"; c) Ms. Layne was concerned about a particular police officer who had threatened her; d) Ms. Layne was concerned about a peeping tom; e) the officers opinion that Ms. Layne was murdered by the sliding glass doors where a huge amount of blood was found.

Ex. 3 – police notes concerning person of interest Todd Davidson.

Ex. 7 – Sampson's supplement report describing Hale.

Ex. 9 – Greg Cox's statement summary concerning an alternative suspect.

Ex. 10 – confidential bulletin issued for William Baker, wanted for questioning in regard to Layne's murder.

Ex. 14 – tips about "mob" connection.

Exs. 15, 17, and 20 - Information that Vincent Layne was present during the murder and in the following days, made statements that appeared related to the murder. Although Vincent was a 4 year-old, special needs child, he could name and identify people that he knew.

Ex. 16 – Police officer Quentin Artis threatened Layne.

Ex. 19 – Linda Hunt, supposedly Layne's best friend, was questioned about a drive-by shooting at Layne's home.

Exs. 22 and 27– Daniel Rogers' description of person seen going into Layne's house on March 31, 1999.

Ex. 23 – lineup viewed by George Hale.

Ex. 25 – Document listing exhibits turned over to prosecutor.

Ex. 26 – Todd Davidson's refusal to waive his Miranda rights.

ECF Dkt. #55 at 3.

Petitioner contends that this additional evidence is admissible in this proceeding for several reasons. ECF Dkt. #57. First, he contends that he filed a request for discovery of exculpatory evidence prior to the commencement of his capital trial. *Id*. at 3. Petitioner also contends that he filed motions for exculpatory evidence and impeachment evidence. *Id*. Petitioner contends that the evidence he obtained during this federal proceeding was not disclosed prior to trial. *Id*. Petitioner further contends that Respondent did not object to his request for leave to conduct discovery or to expand the record. *Id*. at 4. Petitioner concludes that he did not fail to develop the factual predicates of his claim in the state court, but rather, he was precluded from doing so by the State's misconduct. *Id*. Respondent contends, however, that it is permissible for habeas petitioners to amend their petitioner, but they should not be permitted to "run roughshod over the clearly established procedure for doing so." ECF Dkt. #55 at 5. Respondent notes that a petitioner must request leave of the court and the court may need to consider the timeliness of the new claims under the statute of limitations.

-20-

*Id*. citing Fed. R. Civ. P. 15(a); *Mayle v. Felix*, 545 U.S. 644, 663 (2005).

The undersigned acknowledges the merits of each party's argument.  If the State withheld *Brady* material that was not disclosed until discovery in these proceedings, it may be understandable that Petitioner did not include the claim in his initial petition.  On the other hand, once he obtained the information, he should follow prescribed procedures for amending his petition.  Although the discovery violation may have arisen from the same allegedly unconstitutional conduct in the state court, Petitioner identified only one potentially prejudicial error in Ground One of the petition. Regardless, the undersigned fails to see how Respondent has been prejudiced because Respondent has apparently acquiesced to the discovery process and had an opportunity to, and did in fact, address the merits of the issue in its reply brief.  *See* ECF Dkt. #55 at 19-20.  Nonetheless, should the Court find any merit to Petitioner's claims, the Court may find it desirable to determine if those claims "fundamentally alter" Ground One of the initial petition, and if they do, whether they relate back to the original filing date for AEDPA statute of limitation purposes.  It is the undersigned's opinion, however, that the newly presented claims lack merit, making it unnecessary to determine whether they are time-barred or properly appended to the initial petition.  *See Granberry*, 481 U.S. 135.

### ii.    Merits of Ground One

Petitioner contends that the State withheld evidence that was both exculpatory and material. ECF Dkt. #48 at 12-37.  Before reviewing Petitioner's claims, it is necessary to outline the pertinent law under *Brady*.

In *Brady*, the United States Supreme Court held that "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  In later cases, the Court eliminated the requirement for a defendant to request favorable information and stated that the constitutional duty to disclose is "triggered by the potential impact of favorable but undisclosed evidence. . ." *Kyles v. Whitley,* 514 U.S. 419, 434 (1995); *United States v. Bagley*, 473 U.S. 667 (1985); *United States v. Agurs*, 427 U.S. 97 (1976).

To prevail on a *Brady* claim in habeas, a petitioner must demonstrate that the State withheld evidence from the defense at trial that was both material and favorable.  *Kyles,* 514 U.S. at 432; *Brady*, 373 U.S. at 87.

Evidence is considered to be "exculpatory" for *Brady* purposes if it is favorable to the accused.  *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987).  Exculpatory evidence includes impeachment material.  *Bagley*, 473 U.S. at 676.  In fact, inculpatory evidence may be considered *Brady* material if it may be used to impeach a witness.  *Strickler v. Greene*, 527 U.S. 263, 21 (1999).

Evidence is "material" for *Brady* purposes "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles,* 514 U.S. at 433 (internal quotation omitted).  "[A] showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal. . ."  *Id*. at 434.  The *Kyles* Court reaffirmed an earlier holding from *Bagley* outlining four aspects of materiality.  With regard to the first aspect, the *Kyles* Court stated that:

> The "touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles,* 514 U.S. at 435.  The second aspect of materiality is that it is not a sufficiency of evidence test and a defendant need not demonstrate that after discounting inculpatory evidence in light of the undisclosed evidence, there would have been enough left to convict.  *Id*.  "One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  *Id*.

Third, the *Kyles* Court noted that there is no need for harmless error review once a court has found a constitutional error because a *Bagley* error could not be treated as harmless where there is

-22-

a reasonable probability that the result of proceeding would have been different if the withheld evidence had been disclosed. *Kyles,* 514 U.S. at 435.

Fourth, the *Kyles* Court stressed that, in assessing materiality, suppressed evidence must be considered collectively, not item by item. *Kyles,* 514 U.S. at 436. The definition of *Bagley* materiality in terms of cumulative effect provides the prosecution with some deference while imposing a corresponding burden:

> On the one side, showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more. But the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of "reasonable probability" is reached. This in turn means that the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police. But whether the prosecutor succeeds or fails in meeting this obligation (whether, that is, a failure to disclose is in good faith or bad faith, *see Brady,* 373 U.S., at 87, 83 S.Ct., at 1196-1197), the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Kyles,* 514 U.S. at 437-38.

Further, a court is not to consider the motives of the prosecution in withholding the suppressed evidence. *Brady*, 373 U.S. at 87 ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, *irrespective of the good faith or bad faith of the prosecution*.") (emphasis added).

In the instant case, Petitioner asserts that "[t]he amount of evidence the State suppressed is staggering." ECF Dkt. #48 at 1. Petitioner goes on to explain that:

> The prosecution withheld the fact that two witnesses came forward, one on the day Layne's body was discovered and the other within days of that gruesome discovery, and gave the investigating detectives valuable information regarding possible suspects who were seen going into and coming out of Layne's home. Knowing that the accounts of these unbiased witnesses would contradict the testimony offered by the State's witnesses, the State failed to disclose these witnesses to the defense. The State also withheld significant leads pointing to other suspects in the Layne murder. And, astonishingly, the prosecution withheld the fact that the investigating detectives, having observed the crime scene first-hand, had correctly concluded that Layne's throat was slashed in front of the sliding glass doors by an assailant who stood behind her and who then dragged his victim across the floor and dropped her body facedown in front of the couch. The State's failure to disclose this fact is astonishing for two

-23-

reasons. First, the withheld fact confirms the opinion rendered by Mr. Thorne's expert at the postconviction hearing. Second, instead of presenting this theory at trial, the State chose to present the jury a scenario rooted in the baseless musings of a psychic.

*Id*. at 1-2.

The undersigned will separate the evidence into three classes based upon Petitioner's argument:

> (1)  statements of witnesses who allegedly could have undermined the credibility of Wilkes' confession and testimony;
>
> (2)  evidence that allegedly would have enabled the defense to challenge the thoroughness and reliability of the police investigation; and
>
> (3)  evidence that allegedly would have enabled the defense to effectively impeach the prosecution's witnesses.

*See* ECF Dkt. #48 at 14, 17, 26, 28.[4]

Although the *Kyles* court made clear that evidence must be considered collectively, the amount of evidence at issue in this case makes it necessary to individually address each of the foregoing identified classes of evidence and their potential impact on the case. After doing so, the undersigned will ultimately make a recommendation as to whether evidence *considered collectively* raises a reasonable probability that there would be a different outcome in a new trial; this ultimate analysis is the pertinent consideration for *Brady* purposes. *See Kyles,* 514 U.S. at 436; *infra* §V(A)(ii)(4).

---

[4]  Petitioner's traverse has a fourth subheading under the exculpatory portion of the *Brady* claim, but that section sets forth additional argument and does not point out additional potential *Brady* material. Consequently, for organizational purposes in the analysis of exculpatory quality of the evidence, the undersigned will not consider it as a separate class of potential *Brady* material.

-24-

> **(1)** **Statements of witnesses who allegedly could have undermined the credibility of Wilkes' confession and testimony.**

Petitioner first alleges that the State withheld the identities of two witnesses who could have undermined Wilkes' credibility.  ECF Dkt. #48 at 14-17.  Petitioner contends that, nearly two years after he was convicted, he learned that George Hale, a neighbor of Layne's spoke to Detective Sampson within hours of Ms. Layne's body being discovered and gave him very significant information.  *Id*. at 14.  Petitioner claims that:

> Records provided to Thorne in 2001 demonstrate that, on April 1, 1999, between 9:30 and 10:00 a.m., George Hale was walking on Layne's street (Devine) when the sound of yelping puppies caught his attention. ®. 38, Mucklo Ex. 6; Doc. 8, Answer, PCR Hrg. p. 25). Hearing this, Hale looked in the direction of the crying puppies and saw a white male exit Layne's house carrying a garbage bag. Id. Hale also told the police that he saw the man walk around the west side of Layne's house with the garbage bag. Prior to the state postconviction hearing, Hale was shown a photograph of Wilkes. Hale testified that the man he saw leaving Layne's house was not Joseph Wilkes. Id.
>
> Hale described the man as a white male, approximately 5'9" tall, 180 lbs., wearing blue jeans and a short sleeve shirt. ®. 38, Mucklo Ex. 6, p. 2). The man appeared to be in his mid- to late-20s. *Id*. Sampson noted Hale's statement in his report, and then asked him to come to the station and look at a photo array. On April 1, 1999, Detective Sampson showed Hale a photo array with six photos, but he was unable to identify the man he saw coming out of Layne's home that morning. (Doc. 8, Answer, PCR Hrg. 219). The photo array shown to Hale was disclosed to Mr. Thorne during the deposition of Chryssa N. Hartnett, one of the prosecutors responsible for convicting Mr. Thorne. The photo array recently disclosed by Hartnett was shown to Hale and contains Mr. Thorne's picture. *Id*.; (PCR Hrg. 26, 29; Doc. 42, Supplemental Motion to Supplement the Record, Ex. 10). The detectives followed up with Hale at least two more times, showing him photo arrays, but Hale never identified a suspect. (Doc. 8, PCR Hrg. 25-26). Pursuant to this Court's discovery order Mr. Thorne obtained two photo line-up arrays, one containing Mr. Thorne's photo and one containing Mr. Wilkes' photo. (Doc. 42, Exs. 10 and 11). The second photo array recently disclosed to Mr. Thorne contains Wilkes's picture, however, the records contains no reference to whom that array was shown.

ECF Dkt. #48 at 14-15.  Petitioner also contends that crime scene photographs verify that puppies were, in fact, located on Ms. Layne's back porch, providing indisputable support for Mr. Hale's credibility.  *Id*. at 16.  Respondent contends that this evidence is not exculpatory, and even if it is, the State's failure to disclose it was not prejudicial.  ECF Dkt. #55 at 17.   Respondent reasons that George Hale testified at Petitioner's post-conviction relief hearing and stated on direct examination that he saw a man exit Ms. Layne's house, yet on cross-examination, he did not recall whether the

-25-

person was actually in the house.  *Id*. at 16-17.

The undersigned agrees with Respondent's factual assertion regarding Mr. Hale's testimony. Mr. Hale did in fact testify on direct examination that he observed the person exit the home (post-conviction relief hearing transcript (attached to ECF Dkt. #8), hereinafter "PCR Tr." at 23).  Mr. Hale also testified on cross examination that he did not know exactly where the person had come from and that he did not "know for sure that he was in that house."  *Id*. at 37, 40.

The undersigned believes that competent counsel may have been able to use Mr. Hale's direct testimony regarding a person other than Mr. Wilkes being in the home prior to the police investigation.  The undersigned believes, however, that Mr. Hale's testimony was not material because, his testimony on cross examination significantly detracts from the weight of his initial testimony.  Mr. Hale stated that he could not recall seeing the person in Ms. Layne's house:

> Q.   In fact, you don't know exactly where this person was even when you saw him, you can't even remember that, can you?
>
> A.   No.
>
> Q.   You don't know for sure that he was in that house, do you?
>
> A.   No.
>
>                              *        *        *
>
> Q.   Now as you sit there today, you can't recall anything else about that incident other than there was a guy *around* that house carrying some sort of garbage bag, right?
>
> A.   That's it.

PCR Tr. at 37, 40 (emphasis added).  Mr. Hale's testimony does not contribute to a reasonable probability of a different result, even if the Court were to assume that jury would find him to be entirely credible.  In other words, Petitioner emphasizes Mr. Hale's credibility, but his credibility cannot substitute for a lack of substance in his testimony.  The foregoing testimony makes clear that

-26-

Mr. Hale could not testify that he saw anybody inside Ms. Layne's house or exiting her house.

Even if Mr. Hale had seen a person exit Ms. Layne's house, that fact would not have been likely to undermine Mr. Wilkes' testimony, in light of the amount of corroborating evidence that the police discovered. In other words, that fact that a third party may have been in the house between the commission of the murder and the time the police investigated the crime does not change the fact that objective evidence corroborated Mr. Wilkes' confession. As the state trial court found:

> Mr. Wilkes' [sic] took the police to a storm sewer where they recovered a knife and to where a pair of pants were found under some brush. The knife was consistent with the knife sold at K Mart, the knife shown to Mohr and Campbell and the murder weapon. The pants matched a description of the pants Mr. Wilkes was wearing at Carnation Mall the night of the murder.
>
> The knife and pants were tested for human blood. A preliminary test on the knife showed the possibility that there was human blood on the knife. However, further testing failed to return a positive result of human blood. No blood was found on the pants.
>
> However, the condition of the knife and pants was consistent with them having been subject to the elements for several months. According to testimony, this could have accounted for the failure to find blood on either item.

*Thorne*, 2004 WL 2980359 at ¶¶ 9-11; *see also Thorne*, 2004 WL 2980359 at ¶¶ 37-38. Petitioner has presented no evidence to overcome the presumption of correctness of these factual findings. Most notably, Petitioner has not challenged the state court's finding that the knife to which Mr. Wilkes directed police was consistent with the murder weapon.

In *Beuke v. Houk*, 537 F.3d 618, 635-36 (6th Cir. 2008), the Sixth Circuit held that evidence impeaching the credibility of a witness was insufficient to undermine the confidence in a conviction where sufficient objective evidence verified the witness' testimony. More specifically, in *Beuke*, a man was convicted of multiple crimes known as the "mad hitchhiker" shootings, where he would pose as a hitchhiker and shoot the person who was willing to give him a ride. *Id*. at 627-28. The state presented testimony from a friend of the defendant's, who stated that the defendant admitted that he had killed one of the victims. *Id*. at 627. Following his conviction, the defendant filed a petition for a writ of habeas corpus in federal court, alleging a *Brady* violation for failing to produce

evidence relating to the witness' veracity.  *Id*. at 633-34.  The *Beuke* court stated that the alleged *Brady* evidence was only tangentially related to the crime, but even if it was not, the compelling objective evidence would have still rendered it immaterial for *Brady* purposes:

> [E]ven if we were to assume that this undisclosed evidence would have tarnished Cahill's credibility beyond repair, it does not negate or even diminish the substantial objective evidence of Beuke's guilt. Beuke emphasizes the importance of Cahill's testimony by asserting that the prosecution's proof of Craig's murder was dependent upon the credibility of Cahill's testimony. The record discloses a different story, however, because it is clear that the prosecution presented other concrete evidence, in addition to Cahill's testimony, linking Beuke to Craig's murder. This objective evidence includes the officers' discovery of Beuke's fingerprints in Craig's car and forensic evidence indicating that the bullets removed from Craig's body were fired from Beuke's gun. Thus, contrary to Beuke's assertions, Cahill's testimony was not the central piece of evidence holding together an otherwise feeble case, but was merely one piece of a cumulative evidentiary puzzle.

*Id*. at 635-36.  For contrast, the undersigned notes that in *East v. Johnson,* the Fifth Circuit Court of Appeals applied a standard similar to *Beuke* but found a *Brady* violation meriting habeas relief because prosecutors withheld evidence that had impeachment value toward a principal witness *whose testimony lacked corroborating evidence*. 123 F.3d 235, 239 (5th Cir. 1997) ("we have recognized that when the testimony of a witness who might have been impeached by undisclosed evidence is strongly corroborated by additional evidence, the undisclosed evidence generally is not found to be material.").  The *East* court found the impeachment evidence to be material because the state "produced *no corroborating evidence*" for her "most damaging statements" and the state placed more reliance on the witness' testimony than any other item of evidence to establish one particular element of the crime.  *Id*.

The case at bar is more like the situation in *Beuke*, where the prosecution presented objective evidence implicating Petitioner in the murder, than the situation in *East* where the prosecution "produced no corroborating evidence" for  for a principal witness' testimony.  Here, the objective evidence would remain unchanged following the introduction of alleged *Brady* material.  Following the murder, Mr. Wilkes' was able to direct police to a storm sewer, where they located a knife with

-28-

a substance that was potentially blood,[5] that the state court found to be consistent with the murder weapon – again, a finding that is presumed to be correct and that Petitioner has not rebutted.  Mr. Wilkes took police to a bush where, for some reason, he had hidden nylon pants.  Further, as the state court held, the knife is consistent with the knife that Mr. Wilkes' purchased, and the pants are consistent with the pants that Mr. Campbell and Ms. Mohr observed.  Of note, although there was no blood on the pants, the state offered evidence from a forensic expert at trial explaining that the blood most likely would have washed away.  *Thorne*, 2004 WL 2980359 at ¶ 27; Tr. at 951-52.  In fact, the pants had extensive mold growth, indicating that they had been in the elements for "some period of time," undercutting Petitioner's suggestion that police fed details of the crime to Mr. Wilkes.  *See* Tr. at 951-52 (as to forensics); ECF Dkt. #48 at 29-30 (as to Petitioner's contentions). It is most unlikely that Officer Leech "fed" Mr. Wilkes information regarding pants hidden under a bush that were consistent with what Mr. Campbell and Ms. Mohr had seen and that had extensive mold growth consistent with them being in the elements for "some period of time."  Most simply, the pants corroborate Mr. Wilkes' original testimony.

These are all objective findings establishing a sufficient evidentiary basis for the jury to find that Mr. Wilkes committed the murder. While it is true that the objective evidence does not point directly to Defendant's involvement in the murder, the Court must nevertheless consider the probative value of the evidence implicating Mr. Wilkes, in light of Petitioner's assertion that Mr. Wilkes did not commit the murder and in light of Mr. Wilkes' recent recantation of his confession. Mr. Wilkes implicated Petitioner in the murder once already and the jury believed it.  There is little reason to believe that the result would be different at a new trial where the corroborating evidence remains available.

Moreover, objective evidence also corroborated Mr. Wilkes' testimony implicating Petitioner.

---

[5]     *See Thorne*, 2004 WL 2980359 at ¶ 10 ("The knife and pants were tested for human blood. A preliminary test on the knife showed the possibility that there was human blood on the knife. However, further testing failed to return a positive result of human blood. . . However, the condition of the knife and pants was consistent with them having been subject to the elements for several months. According to testimony, this could have accounted for the failure to find blood on either item.")

As Respondent notes, investigators testified at trial that telephone records supported the times and places from which Mr. Wilkes and Petitioner communicated leading up to the murder.  ECF Dkt. #55 at 10; *compare* Tr. at 1146-1165 *with* Tr. at 1205-13, 1229, 1234-35 (Mr. Wilkes' testimony regarding telephone calls).  The day of Ms. Layne's murder, Mr. Wilkes had to borrow $5.00 to buy cigarettes, but later that same day he paid for a hotel room with a $100 bill that Petitioner had given him.  Tr. at 1516 (as to cigarettes); Tr. at 1140 (as to motel).  In fact, defense counsel acknowledged the probative value of the receipt from the hotel in discounting other evidence in the case:

> [TRIAL COUNSEL]: [The use of a forensic specialist in blood spattering] was considered, certainly it was considered, we kept everything opened. But when you – what you have to understand, what was the theme here, Joe Wilkes had confessed to a brutal slaying of an innocent woman.
>
> The crime scene itself had remained from March the 30th until sometime in July when we got involved. And then later on when we went over and did walk-throughs, it was not, in my judgment, the type of information that was such that I wanted to put our theme, our major theme of focus on.
>
> *The issue was Joe Wilkes, the issue was the collaborative evidence that the Alliance Police developed both from the physical evidence they retrieved from the store, they had the receipts from the Comfort Inn,* they had the knife, and I believe another knife that was purchased from the store, they had the individuals -- and, as you would imagine, in most cases not all the witnesses wanted to talk with us, not all of the witnesses would come out and come forward to see us or –

PCR Tr. at 211-13 (emphasis added).  The day following the murder, Mr. Wilkes testified that he turned in his motel room key and Petitioner picked him up at Carnation mall around 9:00.  Tr. at 1230.  The State introduced testimony and time cards to corroborate Mr. Wilkes' by showing the Petitioner left work at that time on April 1, 1999.  Tr. at 1354-55.  Further, Mr. Wilkes testified that, following the murder, Petitioner paid him $200, and he purchased new shoes, roller blades, and a pair of work boots.  Tr. at 1231-34.  The State provided testimony from Karen Enoch, who knew Mr. Wilkes as a friend of her daughter's.  Tr. at 1510.  When a situation arose that Mr. Wilkes had no place to live, the Enochs allowed him to stay at their home.  *Id*. at 1513-15.  Ms. Enoch testified that, the night of the murder, Mr. Wilkes left to meet Petitioner at the mall and stated that he would be spending the night at Petitioner's house.  *Id*. at 1520-21.  Following Ms. Layne's murder, Mr. Wilkes "kept saying David is supposed to bring over the rest of my money."  *Id*. at 1523.  Although, Mr.

-30-

Wilkes claimed the money was for cleaning out Petitioner's grandfather's garage. *Id*. Ms. Enoch testified that on April 6th, 1999, Mr. Wilkes came home from shopping and had purchased Nike socks, new tennis shoes, rollerblades, and a new pair of work boots. *Id*. at 1528. The jury ultimately believed Wilkes' confession; perhaps, due to the corroborative effect of the objective physical evidence confirming that he committed the murder (the knife, the pants, and their peculiar location) and the objective evidence confirming his assertion that he acted at Petitioner's direction (the telephone records, Petitioner's time card, the Comfort Inn receipt, and the items Mr. Wilkes purchased shortly after the murder).

The fact that Mr. Wilkes now has recanted his confession also does not establish a reasonable probability of a different result, even considering the new evidence. His recantation must be viewed with "the utmost suspicion." *State v. Germany*, Case No. 63568, 1993 WL 389577 at *6 (Ohio App. 8 Dist., Sept. 30, 1993), unreported; citing *United States v. Lewis*, 338 F.2d 137, 139 (6th Cir. 1964). The United States Supreme Court has expressed disfavor for granting new trials based upon recanted testimony:

> Recantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction. For these reasons, a witness' recantation of trial testimony typically will justify a new trial only where the reviewing judge after analyzing the recantation is satisfied that it is true and that it will "render probable a different verdict.

*Dobbert v. Wainwright*, 468 U.S. 1231, 1233-34 (1984). Here, Petitioner has offered no explanation for why Mr. Wilkes has not sought his own release, which makes his recantation especially suspicious. Further, Mr. Wilkes' original confession could still be admissible in a new trial against Petitioner and would present compelling impeachment evidence. *See State v. Henderson*, Case No. 21865, 2007 WL 3309454 at *4, (Ohio App. 2 Dist., Nov. 9, 2007), unreported ("After a thorough review of the record and the parties' arguments, we conclude that the trial court did not abuse its discretion when it overruled Henderson's motion for new trial. First, as to Kimberly, should she testify, *the State could easily impeach her recantation with her trial testimony*.") (emphasis added). Therefore, the Court must consider what weight a jury would afford Mr. Wilkes' new version of

events when paired with his original testimony and the objective physical evidence corroborating it. As the Sixth Circuit and the United States Supreme Court have stated:

> A confession is like no other evidence. Indeed, the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him.

*McCray v. Metrish*, 232 Fed.Appx. 469, 474 (6th Cir. 2007) quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991).  Therefore, Mr. Wilkes' confession paired with corroborating objective physical evidence creates a very difficult burden for Petitioner to overcome in attempting to establish that withheld *Brady* material could have shown that Mr. Wilkes was not involved in the murder.  And accordingly, the undersigned believes that a jury would not be likely to afford Mr. Wilkes' revised testimony sufficient weight to establish a reasonable probability of a different outcome.

Petitioner also contends that another neighbor, Daniel Rogers, came forward and told detectives that, he was walking his dog on March 31, 1999, when he saw a man get out of a car, walk up to Ms. Layne's door, feel around the frame of the door, and enter the house.  ECF Dkt. #48 at 15. Petitioner contends that Officer Mucklo had Mr. Rogers look at a few line-ups, but he was unable to identify the man.  *Id.* at 16.  Petitioner contends that, contrary to Mr. Rogers' assertion, Mr. Wilkes' testified that he walked three and a half miles to Ms. Layne's house from the Carnation Mall. *Id*.

The Court has examined the docket, specifically seeking entry 38, exhibits 22 and 27 – the documents Petitioner relies upon in setting forth his claim related to Mr. Rogers.  *See* ECF Dkt. #48 at 15-16.  The Court could locate exhibit 22 but was unable to locate exhibit 27.  Further, exhibit 22 states a few comments about Daniel Rogers, but does not set forth the information that Petitioner contends in citing the document.  *Compare* ECF Dkt. #48 at 15-16 citing ECF Dkt. #38, Ex. 22 *with* ECF Dkt. #38, Ex. 22.  While Petitioner refers to "Rogers' statement" in citing Document 38, exhibit 22, this document appears to be comprised of some investigation notes, not a witness statement. Accordingly, Petitioner has failed to provided sufficient evidence to meet his burden in regard to this claim.

Even assuming Petitioner's claims are true, the undersigned recommends that the Court find

that Mr. Rogers' statements do not establish a reasonable probability of a different outcome.  First, the fact that Mr. Rogers saw someone enter Ms. Layne's house at some indeterminate time on March 31, 1999, does little to establish the likelihood that someone other than Mr. Wilkes committed the murder.  The fact that someone could have been in the house prior to Wilkes does not necessarily impeach Mr. Wilkes' testimony, especially because Mr. Wilkes could not recall what time he had gone to Ms. Layne's home.  *See* Tr. at 1223.   Further, there is no indication that Ms. Layne was even in the house at the same time as this unidentified man.  Without establishing that fact, Mr. Rogers' testimony would have little probative value toward establishing any doubt surrounding Mr. Wilkes' identity as the murderer.  Lastly, the fact that Mr. Rogers was unable to identify the man from a line-up does not impugn Mr. Wilkes' testimony because Mr. Wilkes testified that he walked three and a half miles to Ms. Layne's house from Carnation Mall.  Had Mr. Wilkes testified that he had driven to Ms. Layne's house and Mr. Rogers was unable to identify him from a line-up, then, perhaps Mr. Rogers' testimony would have more probative value.  As it stands, all that Mr. Rogers can establish is that an unidentified male entered Ms. Layne's home at some undetermined time when she may or may not have been home.   His testimony is simply not inconsistent with Mr. Wilkes' testimony because Mr. Wilkes may have arrived at the home later in the day when Mr. Rogers was not present.  Accordingly, the undersigned believes that Mr. Rogers' testimony does not establish a reasonable probability of a different outcome.

> **(2)    Evidence that allegedly would have enabled the defense to challenge the thoroughness and reliability of the police investigation.**

Next, Petitioner contends that the State improperly withheld evidence showing that the detectives investigating this case had impressions and opinions about where Ms. Layne was murdered that differed from their trial testimony.  ECF Dkt. #48 at 17.  Petitioner specifically notes that:

> (1) Detectives Sampson and Mucklo initially concluded that Layne's throat  was cut in front of the sliding glass doors and that she was then "drug to that spot where she lays." (Mucklo Ex. 1, p. 56);
>
> (2) the detectives' conclusions about how and where Layne was murdered  match the conclusions the defense expert, Brent Turvey, testified to at the postconviction hearing;

(3) the State's post-hearing arguments in opposition to Thorne's postconviction claims that there was "sound physical evidence that Wilkes was killer" and that the defense expert's conclusions do not go "to the crux of this case," are contradicted by the detectives' original conclusions about how and where Layne was murdered;

(4) the detectives had many significant leads and suspects other than Wilkes and Thorne;

(5) Wilkes' "confession" about how and where he slit Layne's throat was actually a baseless rumination proposed to Detectives Sampson and Mucklo by a "psychic" with whom they consulted during the investigation;

(6) the detectives' reports confirm that they provided Wilkes with the details of the crime scene and with the details of their fabricated story regarding how and where he murdered Layne;

(7) Detective Leech deceived the then 18-year old Wilkes into confessing to the murder by warning him that Thorne was in the next room and blaming Wilkes for the murder in exchange for immunity, and by intimidating him with threats of the death penalty; and

(8) Layne's 4 year-old child, Vincent, was found roaming around the crime scene when her body was discovered and made statements in the days following Layne's murder that exculpate Wilkes and Thorne of the murder.

ECF Dkt. #48 at 17.

Although, perhaps, some of the foregoing evidence should have been disclosed as potential impeachment or exculpatory evidence, these potential technical discovery violations fall short of establishing a *Brady* violation meriting habeas relief because they fail to overcome the objective physical evidence that corroborated Mr. Wilkes' testimony at trial. Here, Petitioner mainly presents evidence questioning the manner in which the murder actually occurred (*i.e.*, that it occurred in front of the sliding door instead of the couch). *See* items (1)-(3), (5)-(8) above. As previously discussed, however, Petitioner has not overcome the presumption of correctness afforded to the state court's factual findings that: Mr. Wilkes directed police to a storm drain where a knife consistent with the murder weapon was found with a substance that returned a preliminary positive test for blood; that he directed them to the nylon pants he had hidden under a bush and that matched the description of the pants Mr. Campbell and Ms. Mohr had seen him wear night of the murder; and the reasonable

-34-

explanation for the lack of blood on both the knife and the pants.

It is unlikely that a jury would find that Mr. Wilkes did not commit the murder and thereby reject his assertion that Petitioner hired him based upon evidence attacking the mechanics of the crime because there is significant objective evidence corroborating his assertion that he killed Ms. Layne, as discussed above.  The fact that the murder may have occurred in front of the sliding doors instead of on the couch as Mr. Wilkes testified does not change the fact that Mr. Wilkes directed police to a knife in a storm drain that was consistent with the murder weapon and  a pair of pants, similar to those Mr. Campbell and Ms. Mohr had seen him wearing the night of the murder, underneath a bush.  There are few logical explanations for Mr. Wilkes' actions of hiding the pants and the knife, other than that he hid them to avoid detection following the murder.  The jury was presented with these facts and concluded that Mr. Wilkes committed the murder at Petitioner's request.  It is unlikely that the result would change simply because Mr. Wilkes failed to recall or chose not to be entirely truthful as to exactly how he committed the crime.  Reasonable explanations for the alleged inconsistencies between the forensic evidence and Mr. Wilkes' testimony exist. Perhaps the act of the murder occurred quickly and Mr. Wilkes did not recall the particular facts of the event.  Perhaps Mr. Wilkes' memory was still clouded from the cocaine and acid that he had taken earlier, inhibiting his ability to recall the specific details of the murder.  *See* Tr. at 1222. Perhaps Mr. Wilkes did not want to provide any more details than necessary, as he may have been concerned that he could still face the death penalty.  These considerations are not necessary, however, because Mr. Wilkes was able to direct police to tools of the crime, verifying his involvement, regardless of whether he was unable to recall or unwilling to state specific details of the murder itself. The fact remains that objective physical evidence corroborating Mr. Wilkes' confession was presented to the jury, that evidence is now entitled to a presumption of correctness, and there is no indication that the evidence Petitioner now presents would undermine objective evidence that persuaded the first jury.

In fact, the Court can apply Petitioner's own logic to assess the potential effect of the evidence on Mr. Wilkes' credibility. Petitioner contends that eyewitness George Hale saw a man near Ms.

Layne's house, and he remembers looking at that direction because he heard puppies crying.  ECF Dkt. #48 at 15-16.  Petitioner further contends that crime scene photographs verify that puppies were, in fact, located on Ms. Layne's back porch and "indisputably support Hale's credibility."  ECF Dkt. #48 at 16.  By this logic, objective factual consistencies amply support Mr. Wilkes' credibility to provide confidence in the outcome of the trial, even in light of the material that was allegedly wrongfully withheld.  If Mr. Wilkes were not telling the truth about committing the murder, the undersigned fails to see how he was he able to direct police to a knife that was consistent with the murder weapon and contained a substance preliminarily consistent with blood.  If he weren't involved in the murder, the undersigned also fails to see how he could have directed police to a pair of pants under a bush that other people had seen him wearing the night that the murder occurred and how those pants could have accumulated extensive mold growth.

With regard to item (4) in the foregoing list, the undersigned recommends that the Court find Petitioner's claim that police had significant leads on other suspects to be meritless.  While Petitioner contends that "the undisclosed evidence also shows that the police has many other suspects and leads in the months following Layne's death [ ]  [and that] Police reports containing this impeaching information should have been turned over to Thorne's defense attorneys in compliance with *Brady*," (ECF Dkt. #48 at 22) Petitioner provides no authority for the conclusion that the identity of other suspects is *Brady* material and no explanation for why this evidence would have impeachment value. The Sixth Circuit has considered it an "uphill battle" to establish a failure to disclose the identity of other suspects as a valid *Brady* claim meriting habeas relief.  *Coe v. Bell*, 161 F.3d 320, n. 4 (6th Cir. 1998).  The *Coe* court stated "if the reason that the police did not turn over inculpatory evidence about [another suspect] is that they had substantial exculpatory evidence to conclude that he was no longer a suspect, *Brady* would not apply. *Brady* does not exist to provide fodder for misleading reasonable-doubt defenses."*Id*.(emphasis in original).  Further, under *Brady*, "the prosecution is not responsible for providing a complete report to the defense of all police investigatory work," including information pertaining to other suspects. *Jackson v. Anderson*, 141 F.Supp.2d 811 (N.D.Ohio 2001). As discussed above, Mr. Wilkes' confession paired with corroborating physical evidence constitutes

some of the most probable and damaging evidence that could be admitted to establish his involvement in the murder.  *See Fulminante*, 499 U.S. at 296; *McCray*, 232 Fed.Appx. at 474. Therefore, the fact that other people may have had motive or opportunity to murder Ms. Layne should not undermine the Court's confidence in Petitioner's conviction, as it remains supported by Mr. Wilkes' confession, the physical evidence corroborating it, and the state court's factual findings which are now entitled to a presumption of correctness and have not been rebutted.

Petitioner mainly identifies several people with motive and opportunity to commit the murder. ECF Dkt. #48 at 22-26.  The fact that another individual merely had either motive or opportunity to commit the crime is not enough to establish a *Brady* claim. *Spirko v. Anderson*, Case No. 3:95CV7209, 2000 WL 1278383 at *7-*8  (N.D.Ohio July 11, 2000) *aff'd*, 368 F.3d 603 (6th Cir. 2004) (applying the holding from *Coleman v. Calderon*, 150 F.3d 1105, 1116-17 (9th Cir.1998), that a failure to disclose information regarding other suspects did not constitute a *Brady* violation in light of a lack of evidence linking them to the "actual perpetration of the crime.").  One must present evidence linking the third person to the actual perpetration of the crime.  *Id*.  Although Petitioner has had leave to conduct discovery and now has the challenged *Brady* material, Petitioner merely attempts to show motive and opportunity for others to murder Ms. Layne, and falls short of demonstrating that any of the other suspects actually perpetrated the murder of Yvonne Layne.  Again the undersigned notes that overwhelming physical evidence corroborates Mr. Wilkes' trial testimony, and there is no indication that any of the other suspects had anything to do with the knife in the storm drain that the state court found to be consistent with the murder weapon or that they had anything to do with the pants under the bushes.

Petitioner's argument regarding Vincent, Ms. Layne's 4-year old son, is of particular interest. ECF Dkt. #48 at 25-26.  Petitioner contends that weeks after the murder a family member of Ms. Layne told detectives that Vincent was saying over and over "Jimmy pushed mom down . . . mom yelled," and "Jimmy pushed mommy down [and] she yelled you turn that light off . . . ran down driveway [.]"  *Id*. citing ECF Dkt. #38, Mucklo Ex. 20.  Petitioner also contends "that Vincent will say names of people he knows[.]"  *Id*.  quoting ECF Dkt. #38, Mucklo Ex. 15.  Petitioner then

concludes that Vincent "saw the murder, whether it was Wilkes or not."  ECF Dkt. #48 at 26.
Petitioner finally claims that Vincent "keeps talking about a man hurt mommy, and a big mess, and
gotta get a towel and clean it up," but apparently as an oversight, Petitioner points the Court to Mr.
Wilkes' statement rather than the exhibit where Vincent's quote is documented.

　　　　Petitioner contends that this evidence would have been helpful because Mr. Wilkes claimed
that he never saw Vincent in the house.  ECF Dkt. #48 at 26.  Although Mr. Wilkes did testify to that
effect, that fact does not necessarily impeach his testimony.  Tr. at 1224 (as to Wilkes' testimony).
Petitioner incorrectly assumes that if Vincent saw Mr. Wilkes then Mr. Wilkes must have seen him.
That is simply not the case.  The undersigned reiterates that Mr. Wilkes was under the influence of
cocaine and acid at the time.  Tr. at 1222.  Furthermore, Petitioner has failed to demonstrate that
Vincent was discussing the events that occurred on the day of the murder.  Petitioner on one hand
argues that Ms. Layne's injuries were so severe that it was "virtually impossible [for her] to speak"
(ECF Dkt #48 at 37) and on the other hand would like the Court to believe that Mr. Wilkes could not
have committed the murder because Vincent said "Jimmy pushed mommy down [and] she yelled you
turn that light off . . . ran down driveway [.]"  ECF Dkt. #48 at 26.  Therefore, it is possible that
Vincent observed an incident different than the murder or was discussing more than one incident.
Lastly, the evidence Petitioner has provided constitutes hearsay within hearsay, and is not likely to
be admissible.  *See also* Ohio R. Evid. 805.  "[F]or withheld evidence to be material for *Brady*
purposes, it must either be admissible or lead directly to admissible evidence."  *Sawyer v. Hofbauer*,
299 F.3d 605, (6th Cir. 2002).  A petitioner must demonstrate that double hearsay evidence would
be admissible or would lead to the discovery of admissible evidence.  *McKinney v. Fisher*, Case No.
CV-96-177-S-BLW, 2007 WL 2572126 at *13 (D.Idaho Sept. 5, 2007), unreported ("As with much
of the evidence that McKinney alleges contains Brady material, Fleming's notes are double hearsay.
*He has failed to explain how the information would have been admissible* at his trial or at the
sentencing proceeding, or how its disclosure would have led to admissible evidence.") (emphasis
added).  Although Petitioner might be able to obtain testimony from Vincent, it is nevertheless his
burden to establish admissibility before this Court.  It is unclear why, when the Court granted

extensive discovery in this case, Petitioner was not able to obtain additional information quantifying what *admissible* evidence he would produce at trial on this issue.  Accordingly, the undersigned recommends that the Court find that Petitioner has failed to meet his burden in this regard.

Petitioner also contends that the State failed to produce transcripts from Ms. Mohr's witness interview.  ECF Dkt. #48 at 33-34.  Petitioner contends that this evidence would be material because Ms. Mohr contends that Mr. Wilkes ran into her at the Carnation mall and said that he was in Alliance to kill a girl, and that she first learned of the murder when she read about it in the newspaper the next morning; however, Mr. Campbell's interview reveals that Ms. Mohr learned of the murder when her brother called and told her about it.  *Id*. at 33.  Petitioner contends that Ms. Mohr's brother Jason was questioned by police regarding the murder on April 1, 1999, and how Ms. Mohr first learned of the murder calls her credibility into question because the suppressed evidence may have demonstrated that she was trying to protect her brother.  *Id*.  at 33-34.  Petitioner contends that this evidence would have created "ample reasonable doubt."  *Id*. at 34. The undersigned disagrees with this conclusion because it fails to explain why Ms. Mohr's testimony is corroborated by physical evidence.  Ms. Mohr was able to describe the attire that Mr. Wilkes was wearing the night of the murder, which was consistent with the pants hidden under a bush that the forensic expert testified to having extensive mold growth.  *See Thorne*, 2004 WL 2980359 at ¶ 9 (as to the consistency between the description of the pants and the pants that police recovered); Tr. at 951-52 (as to forensics).

Further, the undersigned has reviewed Mr. Campell's statement and fails to see any evidentiary indication the Ms. Mohr knew that police had questioned her brother. The pertinent portion of Mr. Campell's testimony is as follows:

Q.    When did you first hear about the murder?

A.    Uh, the very next morning, April 1st.

Q.    Okay, and who did you hear about that from?

A.    It was, uh, Rose's, uh, brother and her were talking on the phone and Rose had told me what happened.

ECF Dkt. #38 (Tr. Christopher Campbell at 6).  Petitioner points solely to Mr. Campell's statement for the proposition that he could have undermined Ms. Mohr's credibility by establishing motive for her to try to protect her brother with her statements to police.  ECF Dkt. #48 at 33-34.  Mr. Campell's statement is insufficient, however, because even assuming that Ms. Mohr learned of the murder from her brother rather than the newspaper, there is no indication in Mr. Campell's statement that Ms. Mohr was aware that police had questioned her brother.  In short, Petitioner has produced no admissible evidence demonstrating that Ms. Mohr knew her brother had been questioned by police, making the likelihood that Petitioner could impeach her with Mr. Campell's testimony remote. It is Petitioner's burden to present admissible evidence of Ms. Mohr's knowledge of the questioning, and he has simply failed to do so.  *See McKinney*, 2007 WL 2572126 at *13.

Consequently, the undersigned recommends that the Court find Petitioner's claims regarding other potential suspects and the thoroughness and reliability of the police investigation to lack merit.

**(3)    Evidence that allegedly would have enabled the defense to effectively impeach the prosecution's witnesses.**

Next Petitioner claims that the State did not disclose any "narrative supplements" or other police reports to the defense prior to trial.  ECF Dkt. #48 at 26.  Petitioner claims that the most compelling evidence is a report that Detective Leech authored, summarizing his perceptions of Mr. Wilkes' confession:

> [W]hen Sampson asked Wilkes if he had heard Layne was dead, Wilkes sat back in his chair and acted as though he was astonished. He asked, "How. . . When?" I leaned forward and told him to knock off the bullshit. I told Wilkes that it was no coincidence or magic that brought him and I together. I said, "You and David Thorne are responsible for Yvonne Layne's death." Wilkes denied the allegation.
>
> [ . . . ]
>
> [I] explained my conclusion that Thorne was willing to give up Wilkes as the murderer if he could walk away without any charges.
>
> [ . . . ]
>
> I proceeded by telling Wilkes how he had rented a room at the Comfort Inn on the night of the murder. I told him that I knew he had purchased the knife at K-Mart. . . I informed Wilkes that Layne's murder was a capital crime and he could receive the death penalty. I asked him if he was going to just sit there, not saying anything on his own behalf, while Thorne made deals to give him up. . . . Wilkes said, "I'm sorry. I killed her. I'll tell you the whole thing."

[ . . . ]

After the interview concluded Wilkes asked if he was going to get the death penalty. I told him that I didn't know. I explained that his attorney would discuss that with him. He asked if I thought his attorney would be able to get him a life sentence. Again, I told him that I didn't know. I did remind him to think of himself, if his attorney brought any offer that included testimony against Thorne.

ECF Dkt. #48 at 27.  Petitioner contends that this statement is contained in an exhibit to be filed as soon as possible in his Second Supplemental Rule 7 Motion.  As of this date, however, the undersigned is not aware of the exhibit being filed.  In any case, Petitioner contends that Detective Leech "launched into a highly coercive interrogation." *Id*.  Petitioner contends that he threatened that Mr. Wilkes would die unless he confessed and that Detective Leech told lies about Petitioner in stating that "Thorne was willing to give up Wilkes as the murderer if he could walk away without any charges." *Id*. at 27-28.

The undersigned is not entirely clear as to what Petitioner is claiming.  Petitioner may be claiming that police "framed" him and "fed" the evidence to Mr. Wilkes.  *See* ECF Dkt. #23 (Petitioner indicates that Ms. Layne was "having an affair with at least one, and probably multiple, police officers.").  That theory, however, does not merit habeas relief, as Mr. Wilkes' trial testimony is throughly corroborated by other evidence.  While Petitioner emphasizes that Detective Leech "told" Mr. Wilkes that he knew what he had done, it is inconceivable that police could have planted the pants that were consistent with what Mr. Campbell and Ms. Mohr had seen Mr. Wilkes wearing the night of the murder, and that those pants would be covered with extensive mold growth.  It is inconceivable that Mr. Wilkes would be able to direct police to a storm sewer where he knew a knife to be located that was consistent with the murder weapon.  It is inconceivable that Ms. Enoch would testify that Mr. Wilkes happened to stay  at Petitioner's house the night of the murder.  Lastly, it is difficult to believe that police had anything to do with Ms. Enoch's testimony that Mr. Wilkes continually commented that Petitioner owed him money after the murder and that he purchased new shoes, rollerblades, and work boots.  Therefore, if Petitioner is contending that police actively framed him, the Court should reject that argument as meritless and inconsistent with overwhelming evidence of record.

Perhaps Petitioner is contending that police used improper interrogation tactics in questioning Mr. Wilkes.  First, an issue pertaining to improper interrogation tactics would constitute a constitutional claim.  *See Fare v. Michael C.*, 442 U.S. 707, 727 (1979) ("Review of the entire transcript reveals that respondent's claims of coercion are without merit. As noted, the police took care to inform respondent of his rights and to ensure that he understood them. The officers did not intimidate or threaten respondent in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*. *See* 384 U.S., at 445-455, 86 S.Ct., at 1612-1618."). If that is the case, then Petitioner would have to demonstrate standing to challenge Detective Leech's interrogation of Mr. Wilkes, and the undersigned doubts that he could do so.  *See U.S. v. McDowell*, 918 F.2d 1004, 1007 (1st Cir. 1990) ("Because McDowell had no protectable privacy interest at stake during Browne's interrogation, there could be no taint as to McDowell.").

Regardless, the Court could consider the admissibility of Mr. Wilkes' confession in the context of *Brady* materiality.  Of chief concern is whether Detective Leech's notes indicate that Mr. Wilkes' confession was involuntary, and hence inadmissible.  Petitioner also contends that Detective Leech's notes may have impeachment value toward Mr. Wilkes' testimony, but the undersigned has thoroughly discussed the evidence corroborating Mr. Wilkes' trial testimony and sees no need to repeat that analysis here.

In regard to confessions, the Sixth Circuit has stated that:

The Fifth Amendment prohibits the prosecution's use of a defendant's compelled testimony. *Oregon v. Elstad*, 470 U.S. 298, 306-07, 105 S.Ct. 1285, 1291-92, 84 L.Ed.2d 222 (1985). The Due Process Clause of the Fourteenth Amendment also prohibits the admission of coerced confessions procured by means "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109, 106 S.Ct. 445, 449, 88 L.Ed.2d 405 (1985). An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist. *Beckwith v. United States*, 425 U.S. 341, 347-48, 96 S.Ct. 1612, 1616-17, 48 L.Ed.2d 1 (1976) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961)).


An involuntary confession may result from psychological, no less than physical, coercion by law enforcement officials. *Arizona v. Fulminante*, 499 U.S. 279, 285-89, 111 S.Ct. 1246, 1252-53, 113 L.Ed.2d 302 (1991); *Miranda v. Arizona*, 384 U.S. 436, 448, 86 S.Ct. 1602, 1614, 16 L.Ed.2d 694 (1966). [ ] *Howeve*r, not all psychological

-42-

tactics are unconstitutional. In determining whether a confession has been elicited by means that are unconstitutional, this court looks at the totality of the circumstances concerning "whether a defendant's will was overborne in a particular case." Factors to consider in assessing the totality of the circumstances include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

*Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (footnote omitted). Further, "[c]onfessions generally are not vitiated when they are obtained by deception or trickery, as long as the means employed are not calculated to produce an untrue statement." *In re D.A.S.*, 391 A.2d 255, 258 (D.C.1978). Rather, a "determination regarding the voluntariness of a confession ... must be viewed in a totality of the circumstances." *Fulminate*, 499 U.S. at 285-86. In this case, when Detective Leech told Mr. Wilkes that he would die if he did not confess, he was informing him that he would be facing the death penalty for the crime. It was not threat of physical violence that is typically considered to be coercive. As the *Fulminate* Court explained:

> As in *Payne*, where the Court found that a confession was coerced because the interrogating police officer had promised that if the accused confessed, the officer would protect the accused from an angry mob outside the jailhouse door, 356 U.S., at 564-565, 567, 78 S.Ct., at 848-849, 850, so too here, the Arizona Supreme Court found that it was fear of physical violence, absent protection from his friend (and Government agent) Sarivola, which motivated Fulminante to confess.

*Id.* at 288. In this case, however, Detective Leech was merely discussing the legal penalty for the crime, not some secondary form of physical punishment that would result from Mr. Wilkes' failure to cooperate. Unlike the situation in *Payne* and *Fulminate* where officers offered protection from third parties in exchange for cooperation, Detective Leech implied only that Mr. Wilkes may be protected from the legal penalty derivative of the crime if he confessed. His promises were therefore proper.

Likewise, Detective Leech's misleading statements concerning Petitioner confessing do not render Mr. Wilkes' confession involuntary. Not all psychological interrogation tactics are unconstitutional. *Ledbetter*, 35 F.3d at 1067 (6th Cir. 1994). Of particular note to Petitioner's claim,

-43-

the Sixth Circuit has observed that:

> In *Frazier v. Cupp*, the Court held that a confession was voluntary, despite a police officer's misrepresentation to the petitioner that an associate had confessed to the crime. 394 U.S. 731, 737-39, 89 S.Ct. 1420, 1423-25, 22 L.Ed.2d 684 (1969). Apparently, the petitioner had received partial warnings of his Miranda rights prior to making any incriminating statements. Furthermore, he was an adult of normal intelligence. In the Court's view, "**The fact that the police misrepresented the [codefendant's] statements ... is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible.**" *Id*. at 739, 89 S.Ct. at 1425.

> By contrast, in *Spano v. New York*, 360 U.S. 315, 322, 79 S.Ct. 1202, 1206-07, 79 L.Ed.2d 1265 (1959), a pre- Miranda case, the Court held that a confession had been involuntary. In that case, a police officer whom the suspect knew as a close childhood friend persuaded the suspect that the officer might be fired if the suspect did not cooperate with him by giving a confession. Basing its opinion on the totality of circumstances, the Court noted that the confession was obtained after eight hours of continuous questioning by many law enforcement officials, including a skillful prosecutor, from early evening until almost sunrise. Furthermore, the questioning continued despite the suspect's repeated requests to contact his attorney. *Id*. at 318-19, 79 S.Ct. at 1204-05. Throughout the questioning, he followed his attorney's prior instructions not to answer any questions. Only after four lengthy sessions did he finally agree to make a statement. *Id*. at 319, 79 S.Ct. at 1204-05.

*Ledbetter*, 35 F.3d at 1068 (emphasis added).  In reversing a district court's holding that a confession was involuntary, the Sixth Circuit explicitly stated that "[a] defendant's will is not overborne simply because he is led to believe that the government's knowledge of his guilt is greater than it actually is." *Ledbetter*, 35 F.3d at 1070.

Here, Petitioner has pointed to no evidence of the coercive tactics demonstrated in *Spano*. Rather, the case at bar can be likened to *Frazier*, because stating that a codefendant has confessed is in and of itself insufficient to render a confession inadmissible.  Petitioner has failed to demonstrate that other techniques, cumulatively,  rose to the level of coercion in this case, and, therefore, Mr. Wilkes' testimony was properly admissible.  Ultimately, this conclusion means that Detective Leech's notes are not "material" for *Brady* purposes.

### (4)    Whether all of the alleged *Brady* material considered collectively establishes a reasonable probability of a different outcome

Lastly, in regard to Petitioner's *Brady* claim, the Court must determine whether the alleged *Brady* material collectively establishes a reasonable probability of a different outcome on retrial. The

-44-

undersigned recommends that the Court find that it does not.  In this case, the physical evidence corroborating Wilkes' testimony both admitting to the murder and implicating Petitioner is overwhelming.  Further, the testimony from Ms. Enoch, Mr. Campbell, and Ms. Mohr, also corroborate Mr. Wilkes' testimony.  Petitioner now seeks to establish a *Brady* claim by pointing to Mr. Wilkes' recantation,  the possibility that other people were in Ms. Layne's home before or after the murder, the possibility that police considered other suspects, and the propriety of Mr. Wilkes' interrogation.  Petitioner mainly attacks Mr. Wilkes' credibility at trial, and contends that new evidence would show it would have been impossible for the murder to occur the way in which he described.

All of this evidence considered together, however, fails to overcome the fact that Mr. Wilkes was able to direct police to a knife that was consistent with the murder weapon and to pants that were consistent with pants that Ms. Mohr and Mr. Campbell had seen him wear the night of the murder.  Petitioner's claims fail to overcome the fact that the pants were covered with extensive mold growth and hidden under a bush, consistent with Mr. Wilkes hiding them to avoid detection following the act.  His claims also fail to overcome the unlikely location of the knife in the storm drain.  They fail to overcome the corroborating telephone records and time cards.  They fail to overcome Ms. Enoch's testimony that Mr. Wilkes' whereabouts were unaccounted for on the night of the murder, that he expected payment from Petitioner following the murder, and that he bought new shoes, rollerblades, and work boots after meeting with Petitioner following the murder.  While some of the evidence may establish that the murder occurred differently from Mr. Wilkes' testimony, there are reasonable explanations for any disparities between Mr. Wilkes' testimony and what actually transpired during the murder, including the excitement of the situation, Mr. Wilkes' earlier drug usage, and his incentive to avoid the death penalty.  Consequently, the undersigned recommends that the Court find that Petitioner has failed to demonstrate that the presented evidence is material for *Brady* purposes and that Ground One lacks merit.  The undersigned further recommends that the Court dismiss Ground One in its entirety with prejudice.

### iii.    Merits of Ground Two

In Ground Two, Petitioner contends that he was denied effective assistance of trial counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution.  In subclaim 1, Petitioner claims that counsel failed to conduct any investigation into the case in order to prepare an adequate defense.  ECF Dkt. #1, Ex. B at 2.  In subclaim 2, Petitioner contends that there was a lack of physical evidence tying Mr. Wilkes to the murder, and therefore, trial counsel was ineffective for failing to obtain a forensic expert regarding the blood patterns left at the scene.  ECF Dkt. #48 at 38.  Petitioner has withdrawn subclaims 3 and 4.  ECF Dkt. #48 at 38.

In order to prevail on a claim of ineffective assistance of trial counsel, Petitioner bears the burden of showing that counsel's performance fell below an objective standard of reasonableness and counsel's ineffectiveness prejudiced his defense so as to deprive him of his right to a fair trial.  *Strickland v. Washington*, 466 U.S. 668 (1984).  To warrant reversal of a conviction, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  Court scrutiny of defense counsel review must be "highly deferential." *Id*. at 689. Decisions that "might be considered sound trial strategy" do not constitute the ineffective assistance of counsel.  *Michel v. Louisiana*, 350 U.S. 91, 101 (1955).   Trial counsel's tactical decisions are not completely immune from Sixth Amendment review, but they must be particularly egregious before they will provide a basis for relief.  *Martin v. Rose*, 744 F.2d 1245, 1249 (6th Cir. 1984).

Further, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the [ultimate] judgment."  *West v. Seabold,* 73 F.3d 81, 84 (6th Cir. 1996), quoting *Strickland,* 466 U.S. at 691, quoted in *Smith v. Jago*, 888 F.2d 399, 404-05 (6th Cir.1989), *cert. denied*, 495 U.S. 961 (1990).  "Counsel is constitutionally ineffective only if performance below professional standards caused the defendant to lose what he otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir.1992) (en banc), *cert. denied*, 508 U.S. 975 (1993).

-46-

### (1)      Subclaim (1): Counsel's investigation

In subclaim 1, Petitioner alleges that his trial counsel was ineffective because he failed to contact potential witnesses and obtain other evidence that would have been beneficial.  *See* ECF Dkt. #48 at 38-43.   Petitioner, however, has failed to identify these witnesses and evidence or  to otherwise develop this argument.  "[C]omplaints of uncalled witnesses are not favored in federal habeas corpus review because allegations of what the witness would have testified to are largely speculative." *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002).  In order to present an ineffective assistance of counsel claim based upon a failure to call a witness, a defendant must make an affirmative showing as to what the missing evidence would have been and prove that the witness' testimony would have produced a different result.  *Malcum v. Burt,* 276 F.Supp.2d 664, 679 (E.D.Mich.,2003) citing *United States ex. rel. Jones v. Chrans,* 187 F.Supp.2d 993, 1009 (N.D.Ill.2002).

Here, Petitioner not only fails to identify the potential witnesses that counsel failed to contact, but he also fails to provide affidavits or support from these individuals as to the testimony that they would have given in order to show that they would have appeared to testify and that their testimony would have been favorable to Petitioner.

Accordingly, the undersigned recommends that the Court find that "[i]n this case, trial counsel's failure to investigate, interview, or present these potential witnesses does not amount to the ineffective assistance of counsel, because Petitioner has failed to indicate the availability of these purported  witnesses or specify the content of their testimony." *See Malcum,* 276 F.Supp.2d at 679, citing *Dell v. Straub,* 194 F.Supp.2d 629, 650 (E.D.Mich.2002) (citations omitted).

Insofar as Petitioner contends that counsel failed to interview the State's main expert or to request forensic testing of key evidentiary items, the undersigned recommends that the Court dismiss those claims as unsupported.  Petitioner has not identified why it was necessary to interview the expert or obtain forensic testing(deficient performance) or how the outcome of the trial would have been different if he had done so (prejudice).   The undersigned therefore recommends that the Court

-47-

dismiss Ground Two subclaim 1.

>    **(2)**    **Subclaim (2): Counsel's alleged failure to consult a forensic expert**

The undersigned recommends that the Court dismiss Ground Two subclaim 2 for lack of merit because Petitioner has not shown prejudice. In determining whether Petitioner has suffered prejudice, the Court should consider the amount of evidence corroborating Mr. Wilkes' claim that he committed the murder. *See Hutchinson v. Hamlet*, 243 Fed.Appx. 238, 242 (9th Cir. 2007). In *Hutchison*, the Ninth District Court of Appeals held that California appellate courts unreasonably applied *Strickland* for not finding ineffective assistance where a defendant claimed that his attorney failed to hire an expert to analyze the height of a perpetrator on a surveillance camera and "the case against Hutchinson was not corroborated by any physical or other forensic evidence, confessions, or admissions." *Id*. The Sixth Circuit articulated a similar standard in *Richey v. Mitchell*, 395 F.3d 660 (6th Cir.,2005). In an arson case, the Court noted:

> These experts' attacks on the State's evidence would have been all the more powerful given the absence of corroborating physical evidence. Neither Richey's clothing, boots, or bandage revealed the presence of accelerants. No empty canisters of flammable liquids were found at or around the scene. And the owner of the neighboring greenhouse-from which the State theorized Richey stole the accelerants-was unable to determine whether anything was missing.

*Id*. at 686. The United States Supreme Court vacated the judgment due to the Court of Appeals' reliance on evidence that was not properly presented to state habeas courts. *Bradshaw v. Richey*, 546 U.S, 74, 79 (2005). On remand, the Sixth Circuit again held that counsel was ineffective. *Richey v. Bradshaw*, 498 F.3d 344, 361-64 (6th Cir. 2007). The court reasoned that the state put forth a specific theory as to how the petitioner had set the fire, asserting that he stole paint thinner and gasoline from the greenhouse across the street, brought them back to Collins's apartment where he poured them on her living room carpet and deck, and ignited them. *Id*. at 362. The court further noted that the state supported its theory with detailed scientific testimony from two experts and concluded that "[t]he scientific evidence of arson was thus fundamental to the State's case." *Id*. Since trial counsel had done "next to nothing" to determine if the state's arson conclusion was impervious to attack, the *Richey* court granted the petitioner a writ of habeas corpus based on a claim

-48-

of ineffective assistance of counsel.

Applying the rule of law from *Richey*, the Court should determine whether forensic evidence was fundamental to the State's case specifically in regard to how the murder occurred, as opposed to whether Mr. Wilkes perpetrated the murder.  If scientific evidence was fundamental, then there is a greater likelihood that Petitioner suffered prejudice by any deficient performance of counsel for not consulting a forensic expert.  The Court should then determine whether the State's case was corroborated by sufficient non-scientific evidence, such that the Court could have confidence in the outcome of the trial even in light of Petitioner's proffered expert testimony.

In *Richey*, scientific evidence was fundamental to establish whether a crime had even been committed.  The forensic evidence could have shown that the fire at issue was accidental and not the result of arson at all.  *Richey*, 498, F.3d at 364 ("There is a reasonable probability that had his counsel mounted the available defense that the fire was caused by an accident, and was not the result of arson at all, the outcome of either the guilt or the penalty phase would have been different.").

The situation here is different because scientific evidence was not fundamental for the State to establish the fact that a crime had been committed.  From the crime scene photographs, it is unfortunately quite clear that Ms. Layne had been murdered.  *See, e.g.,* ECF Dkt. #39, photographs 87-91.  Unlike *Richey*, the State primarily relied upon the confession of the alleged perpetrator, Mr. Wilkes, and the fact that he was able to direct police to the tools of the crime.  While the *Richey* court found prejudice even in light of other circumstantial evidence inculpating the defendant, the evidence in this case is much stronger because the State produced a confession, which is "probably the most probative and damaging evidence" that could have been admitted to establish Mr. Wilkes' culpability (*McCray*, 232 Fed.Appx. at 474), evidence corroborating the confession, and the fact that, by admitting to committing the murder, Mr. Wilkes guaranteed himself a significant prison sentence. Although Petitioner also questions Mr. Wilkes' credibility regarding his testimony that Petitioner orchestrated the crime, the central issue in regard to defense counsel's alleged ineffectiveness for not hiring a forensic expert relates to the identity of the murderer and therefore attacks Mr. Wilkes' veracity regarding whether he committed the murder.  Due to the potential penalties, it is highly

unlikely that he would lie about committing the murder for the sole purpose of falsely implicating Petitioner in hiring him to do so. The fact that Mr. Wilkes was able to verify his acts by directing police to the criminal tools not only removes any reasonable doubt as to his involvement in the murder, but is so compelling that the Court can maintain confidence in the outcome regardless of whether questions remain as to exactly how and where Ms. Layne was killed. Unlike *Richey*, the mechanics of the crime are not crucial to the case at bar because it was clear that a crime had occurred.

The question for the jury was *who* committed the act. When faced with an in-court confession and corroborating evidence, the jury found beyond a reasonable doubt that Mr. Wilkes committed the crime at Petitioner's direction. The fact that he may have murdered Ms. Layne in front of the sliding glass doors rather than on the couch will not change the fact that he directed police to the tools of the crime. Therefore, forensic evidence would not be likely to affect the outcome of the trial. In contrast, in the *Richey* case, the forensic evidence could have shown that the fire at issue was accidental and not the result of arson at all. Here, forensic evidence will not show that Ms. Layne was not murdered.

Lastly, as discussed above, there are legitimate reasons for any discrepancies between the physical evidence at the crime scene and Mr. Wilkes' testimony regarding the specific events during the murder itself (the excitement of the situation, his earlier drug usage, and his desire to avoid the death penalty). The objective evidence (the knife, the pants, their peculiar location, the telephone records and the items that Mr. Wilkes purchased after meeting with Petitioner) corroborating Mr. Wilkes' involvement in the crime remains unaffected. Therefore, even assuming that Petitioner can establish that his trial counsel was ineffective for not hiring a forensic expert, the undersigned recommends that the Court dismiss this claim for Petitioner's failure to establish any prejudice.

For the foregoing reasons, the undersigned recommends that the Court dismiss Ground Two in its entirety with prejudice.

### iv.     Merits of Ground Three

In Ground Three, Petitioner contends that the State violated his Fifth, Sixth, and Fourteenth Amendment rights to a fair trial by presenting evidence that it knew or should have known to be false. ECF Dkt. #48 at 43.  The United States Supreme Court has stated that due process prevents the prosecution from knowingly presenting false evidence:

> [Due Process] is a requirement that *cannot be deemed to be satisfied by mere notice and hearing if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured.* Such a contrivance by a state to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation. And the action of prosecuting officers on behalf of the state, like that of administrative officers in the execution of its laws, may constitute state action within the purview of the Fourteenth Amendment.

*Mooney v. Holohan*, 294 U.S. 103, 112-13 (1935) (emphasis added).   To establish a due process violation based upon the introduction of false testimony, Petitioner must demonstrate that (1) Wilkes' testimony was false, (2) the prosecution knew it was false, and (3) it  was material.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959), *Byrd v. Collins*, 209 F.3d 486, 517 (6th Cir. 2000).  In establishing falsity, Petitioner "must show that the statement in question was 'indisputably false,' rather than merely misleading." *Byrd*, 209 F.3d at 517-18 quoting *United States v. Lochmondy*, 890 F.2d 817, 822 (6th Cir.1989).

In the case at bar, Petitioner contends that his conviction was based upon false evidence because "[t]he physical evidence of the crime scene belies the detailed account of the murder offered by Wilkes during Mr. Thorne's trial." ECF Dkt. #1, Ex. B at 3.  Petitioner further contends that Mr. Wilkes recanted his earlier testimony under oath and his youth minister testified that he stated the night before trial: "if I tell the truth they told me I would die, and I'm too young to die." ECF Dkt. #1, Ex. B at 3.  Petitioner concludes that "[t]here is ample evidence to conclude that Wilkes's recantation is credible."

First, Petitioner has not established that Mr. Wilkes was not telling the truth at trial.  To the contrary, significant other evidence corroborated Mr. Wilkes' testimony.  The undersigned does not

find the fact that Mr. Wilkes' recanted his confession under oath to be very persuasive, as his testimony implicating Petitioner at trial was also made under oath.    Further, the state court has already weighed Mr. Wilkes' testimony under oath at the post-conviction hearing and found it to be incredible:

> {¶ 32} At the evidentiary hearing, Mr. Wilkes stated that his prior statements against appellant were false and that neither he nor appellant had anything to do with the victim's death. Mr. Wilkes claimed that any information he possessed regarding the murder was given to him by the Alliance Police. Mr. Wilkes asserted that he implicated appellant because he was afraid and felt that he had no choice.

> {¶ 33} Appellant argues that Mr. Wilkes' recantation is supported by the testimony of Brent Turvey, a private crime scene investigator, and Michael Robertson, a questioned documents examiner. Mr. Turvey testified that upon his review of the forensic documentation available, including photographs of the crime scene, the crime could not have occurred as described by Mr. Wilkes. Mr. Wilkes claimed that the victim was first attacked while on the couch and then moved to a sliding glass door, before she collapsed. Mr. Turvey claimed that the photographs showed that the victim was attacked while she stood at the sliding glass doors and then was partially dragged to where she was found. Mr. Turvey claimed that any blood found on the couch was transferred to the couch by the attacker.

> {¶ 34} Michael Robertson testified as a questioned documents examiner. Mr. Robertson compared the writing on the business card on which Mr. Wilkes allegedly wrote his name and phone number when he spoke with Rose Mohr and Chris Campbell at the Carnation Mall. Ms. Mohr claimed that appellant wrote on the card at the same general time he told her and Mr. Campbell that he had been hired by someone to kill a girl. Mr. Robertson compared the card to a sample given to him which was claimed to be a sample of Mr. Wilkes' handwriting. Mr. Robertson concluded that the handwriting on the card was not written by the same person that wrote the sample. From that conclusion, appellant argues that Ms. Mohr provided perjured testimony in regard to the business card and thus the rest of her testimony is tainted.

> {¶ 35} Recantations of prior testimony are to be examined with utmost suspicion. *State v. Germany* (Sept. 30, 1993), Cuyahoga App. No. 63568 citing *United States v. Lewis* (C.A.6, 1964), 338 F.2d 137, 139). "Recantation by a significant witness does not, as a matter of law, entitle the defendant to a new trial. This determination is left to the sound discretion of the trial court." *State v. Walker* (1995), 101 Ohio App.3d 433, 435, 655 N.E.2d 823.

> {¶ 36} We find that the trial court did not abuse its discretion in denying appellant a new trial. First, the trial court found Mr. Wilkes' recantation incredible. It appears that the trial court also found Mr. Turvey's testimony either incredible or unpersuasive in light of the evidence that supports a finding that Mr. Wilkes committed the murder. Such matters of credibility are primarily entrusted to the trial court. *State v. Rieke* (Aug. 14, 1997), Cuyahoga App. No. 71237, 1997 WL 473095 ("Considerable latitude is entrusted to the trial judge because of his opportunity to judge the impact of the

-52-

evidence, newly discovered or recanted, and place it in proper perspective. The issue is essentially one of credibility and that is entrusted to the trial judge.")

**{¶37} Further, we agree with the trial court that there is also significant evidence to support a conclusion that Mr. Wilkes committed the crime. Mr. Wilkes not only told to the police, and subsequently to the jury, the details of his offense but took police to where they could recover a knife which was consistent with the knife used to kill the victim. The knife was identical to a knife purchased at the K Mart at Carnation Mall on March 31, 1999, at 8:10 P.M. Around that same time, Mr. Wilkes was seen at the Carnation Mall by Ms. Mohr and Mr. Campbell. Mr. Wilkes proceeded to show these two people a knife, which was consistent with the knife sold at K Mart and consistent with the knife recovered through Mr. Wilkes. The knife had a substance on it that gave a preliminary positive test result for blood although the substance could not be further identified as human blood. According to Mr. Campbell, Mr. Wilkes told these people that he was in Alliance to handle some business. When asked what business, Mr. Wilkes showed them the knife. Tr. of Trial, Vol. VI, pg. 1487. According to Rose Mohr, Mr. Wilkes showed them the knife and said "that he was there to kill some girl in Alliance, that some guy had paid him." Tr. of Trial, Vol. IV, pg. 1113.**

**{¶ 38} Mr. Wilkes was wearing a nylon workout suit at the Mall. After confessing, Mr. Wilkes told the police where to find the pants he wore that night. Nylon pants like the ones he claimed he wore and as seen by Ms. Rohr [sic] and Mr. Campbell were found where Mr. Wilkes said the pants would be found.**

{¶39} As to the issues concerning the business card, Mr. Robertson testified that the handwriting on the business card was not written by the same person that wrote the sample. However, there are questions as to who actually wrote the sample. Mr. Robertson did not witness the writing of the sample but merely received the sample from a woman named Sue Gless. Sue Gless did not testify at the hearing.

*Thorne*, 2004 WL 2980359 at *5-*7 (emphasis added).  Based on the standard articulated in *Napue*, the foregoing is not an unreasonable application of clearly established Federal law.  Petitioner has not presented clear and convincing evidence to merit reversal of the state court's factual determination.  Accordingly, Petitioner has failed to establish that Mr. Wilkes' trial testimony was indisputably false, and cannot meet the first prong of the *Napue* test.

Even so, Petitioner has failed to establish that the State had any knowledge that Mr. Wilkes provided false testimony.  At the time of trial, the State had only Mr. Wilkes' confession available, not his recantation.  Therefore, even assuming Mr. Wilkes told the truth when he recanted his confession, it is unlikely that the State *knew* Mr. Wilkes was not telling the truth at trial.   Petitioner relies on a recantation developed after his conviction and forensic evidence that (only arguably)

impeaches his testimony regarding the specific events surrounding the murder.  To go so far, however, as to say that the State *knew* Mr. Wilkes' testimony was false is a leap.  No agents of the State were in the room at the time the murder occurred to have actual knowledge as to how it actually happened.  To claim now, as Petitioner does, that *opinion* evidence of forensic experts establishes *indisputably* that the murder occurred a certain way and that the State therefore *knew* Mr. Wilkes' testimony to be false would truly stretch the bounds of *Napue*.  It falls short of the Sixth Circuit's requirements, as articulated in *Byrd*.  At best, Petitioner has established mere uncertainty surrounding Mr. Wilkes' veracity, and this showing is insufficient to show the State's  requisite knowledge of false testimony in order to merit relief on a habeas claim.  It shows only the necessity of a trial to answer questions of fact.  *See Jenkins v. State*, 912 S.W.2d 793, 819 (Tex.Cr.App.,1993) ("The main purpose of cross-examination is to test the truth and veracity of the witness' testimony on direct examination.").

Since Petitioner has failed to establish either that Mr. Wilkes' testimony was false or that the State knew it was false, the undersigned recommends that the Court dismiss Ground Three in its entirety with prejudice.

### v.    **Ground Four is Withdrawn**

Petitioner has withdrawn Ground Four.  ECF Dkt. #48 at 44.  Therefore, the undersigned recommends that the Court dismiss it in its entirety with prejudice.

### vi.    **Merits of Ground Five**

Lastly, in Ground Five, Petitioner contends that the cumulative effect of the trial errors violated his rights to due process and a fair trial.  ECF Dkt. #1, Ex. B at 4.  Petitioner noted that the Sixth Circuit has ruled that such an argument is not cognizable in post-AEDPA habeas cases, but the United States Supreme Court has not yet ruled on the matter, making it a viable and necessary claim.  ECF Dkt. #48 at 44.

Claims of cumulative error are not cognizable grounds for habeas relief.  *Millender v. Adams*, 376 F.3d 520, 529  (6th Cir. 2004).  The Sixth Circuit has stated "[t]he Supreme Court has not held

-54-

that distinct constitutional claims can be cumulated to grant habeas relief." *Id*. quoting *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002).  In fact, the *Lorraine* court held that a district court "overstepped its bounds on habeas review" by ruling that the cumulative weight of prosecutorial misconduct and ineffective counsel warranted habeas relief. *Lorraine*, 291 F.3d at 447.  Accordingly, the undersigned recommends that the Court dismiss Ground Six of the instant petition with prejudice due to a lack of merit.

The undersigned recommends that the Court adhere to Sixth Circuit precedent and find that Ground Five is not cognizable.  As a contingency, the undersigned further recommends that the Court make a factual finding that  the alleged errors do not cumulatively amount to a constitutional violation because there was significant evidence corroborating Mr. Wilkes' testimony at trial to provide reliability in the outcome of the result, and therefore prejudice is lacking.  For these reasons, the undersigned recommends that the Court dismiss Ground Five in its entirety with prejudice.

## VI.    CONCLUSION

For the foregoing reasons, the undersigned RECOMMENDS that the Court DISMISS the instant petition in its entirety with prejudice.


DATE: June 30, 2009 _____      *s/ George J. Limbert*_____
_____      GEORGE J. LIMBERT
                                       UNITED STATES MAGISTRATE JUDGE


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within ten (10) days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).